STATE OF NORTH CAROLINA v. JAMES LARRY GAPPINS

No. 384A86

(Filed 7 July 1987)

1. **Criminal Law §§ 39, 87.4— murder—redirect examination—witness's opinion of defendant's intent—proper**

    In a murder prosecution arising from an incident outside a bar, the trial court did not err by allowing a witness to testify that, in his opinion, the defendant wanted to whip or shoot a black soldier where the testimony was elicited by the prosecutor on redirect examination after defense counsel had asked during cross-examination whether the witness recalled saying that he felt like defendant wasn't going to hurt anyone, that he just wanted to scare them.

2. **Criminal Law § 169.5— murder—testimony about decedent's hobbies and talents—not prejudicial**

    There was no prejudicial error in a murder prosecution in allowing the decedent's father to testify as to decedent's hobbies and talents, although the evidence was irrelevant, where eyewitness testimony identified defendant as having shot and killed the unarmed deceased without provocation.

3. **Criminal Law § 85— character evidence—cross-examination about specific acts—no error**

    The trial court did not err in a murder prosecution by allowing the prosecutor to cross-examine defendant's character witnesses about specific instances

of conduct by defendant where defendant put his character in issue by having witnesses testify concerning his reputation for peacefulness, a "pertinent trait of his character." N.C.G.S. § 8C-1, Rules 404(a)(1) and 405(a).

**4. Homicide § 28.1 — murder — failure to instruct on self-defense or manslaughter — no error**

The trial court did not err by failing to instruct the jury on self-defense or on voluntary manslaughter based on imperfect self-defense where the evidence, viewed in the light most favorable to defendant, indicates that defendant was the aggressor during the entire incident, that the killing was an accident, and that defendant had not formed either a belief that it was necessary to kill the victim or an intent to kill him in order to protect himself from death or great bodily harm.

**5. Criminal Law § 181 — newly discovered evidence — motion for new trial denied — no error**

The trial court did not err in a murder prosecution by denying defendant's motion for a new trial under N.C.G.S. § 15A-1415(b)(6) based on newly discovered evidence that psychotherapists at a clinic which evaluated defendant felt that defendant was suffering from Post Traumatic Stress Disorder resulting from his experiences in Vietnam where the opinions of the two psychotherapists were related to the evaluating psychiatrist, who did not adopt them or incorporate them into his report, but who did note defendant's tour in Vietnam and assessed it as "relatively stressful."

APPEAL by the defendant from judgments entered by *Brewer, J.*, at the 23 January 1986 Session of Superior Court, CUMBERLAND County.

The defendant was charged in a two count indictment with first degree murder and misdemeanor assault by pointing a gun. The jury found him guilty as to both counts, and he received sentences of life imprisonment and six months imprisonment, to be served consecutively. The defendant appealed the murder conviction and resulting sentence of life imprisonment to the Supreme Court as a matter of right. His motion to bypass the Court of Appeals with regard to his appeal of the assault conviction was allowed on 7 July 1986. Heard in the Supreme Court on 13 April 1987.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Special Deputy Attorney General, and William P. Hart, Assistant Attorney General, for the State.*

*Nance, Collier, Herndon, Wheless, Guthrie & Jenkins, by James R. Nance, Jr. and Constance McLean Ludwig, for the defendant appellant.*

MITCHELL, Justice.

The State presented evidence which tended to show that in the early morning hours of 8 June 1985, approximately ten soldiers from Fort Bragg drove into Fayetteville to the Silver Dollar Lounge. A fellow soldier had returned to the army base to summon them after he and another soldier got into an argument with some civilians at the Silver Dollar Lounge. He had left his friend at the bar and returned to the base to get help, because he thought his friend might encounter difficulty leaving the bar.

When the soldiers arrived, they parked across the street from the lounge. Two of them went in to see if their friend was still there. The others dispersed around the area. Carl Crawford and Damon Monjure stood by a tree beside a parked truck. Not finding their friend inside the bar, someone went to call the base to see if he had gone there. While the soldiers were waiting, the defendant came out of the bar and began walking toward his truck. Seeing the defendant, and assuming it was his truck, Crawford and Monjure crossed the street to return to their vehicles.

The defendant began yelling at the two soldiers, demanding to know what they were doing to his truck. The defendant then went to his truck, withdrew a Winchester .30-.30 rifle and followed Crawford and Monjure across the street to the place where the other soldiers were standing. Pointing the rifle at Crawford, the defendant said, "I know it was you and I know it was you." The defendant cocked his rifle and told Crawford to move into the street, saying that one, if not all, of the soldiers was going to get his bullet.

Two acquaintances of the defendant who had also come out of the bar attempted to calm him, telling him that the soldiers had done nothing to his truck and to leave. The defendant demanded to know what the soldiers were doing there, to which Sergeant Gregory Buchanon responded that they were just taking a break. The defendant, walking over to Buchanon, said, "Oh, you felt like taking a break." The defendant's acquaintances continued to coax him to leave, but the defendant told them to leave him alone saying: "No, this would be self defense." He told Buchanon to take his hands out of his pocket. As Buchanon was moving his hands

into the air, the defendant shot him in the neck, causing his death.

Other evidence introduced at trial is reviewed and discussed where pertinent throughout this opinion.

[1] By his first assignment of error, the defendant contends that the trial court erred in allowing the State's witness Gilbert McLaurin to testify over objection to his opinion, at the time immediately before the shooting, of what the defendant intended to do. The witness who had been drinking in the bar with the defendant the night of the murder, testified that, in his opinion, the defendant wanted to whip or shoot the black soldier, Crawford. We agree with the defendant that ordinarily a witness may not give his opinion of another person's intention on a particular occasion. *State v. Sanders*, 295 N.C. 361, 369-70, 245 S.E. 2d 674, 681 (1978); *State v. Brower*, 289 N.C. 644, 661, 224 S.E.. 2d 551, 563 (1976). However, we find no merit in this assignment of error.

The testimony about which the defendant complains was elicited by the prosecutor on redirect examination of the witness only after defense counsel had asked the witness during cross examination: "Do you recall telling Mr. Wadkins that you felt like Larry [the defendant] wasn't going to hurt anybody, he just wanted to scare them?" The only questions asked by the prosecutor concerning the witness's opinion as to the defendant's intentions were for the purpose of clarifying the witness's answer to defense counsel's prior question on the matter. Questions seeking an explanation on redirect examination of matters brought out by the defendant on cross examination are proper. The answers are admissible even though they might have been inadmissible if the State had opened the line of inquiry in the first instance. *State v. Williams*, 315 N.C. 310, 320, 338 S.E. 2d 75, 82 (1986). A defendant may not deliberately elicit testimony and then later complain of its admission. *State v. Hunt*, 297 N.C. 447, 450, 255 S.E. 2d 182, 184 (1979). It was therefore not error to permit the witness to testify as to his opinion of the defendant's intentions, the defendant having "opened the door." *State v. Avery*, 315 N.C. 1, 27-28, 337 S.E. 2d 786, 801 (1985).

[2] The defendant also contends that the trial court committed prejudicial error in allowing the decedent's father to testify as to the decedent's hobbies and talents. This contention is without

merit. The prosecutor elicited testimony during direct examination of the witness that the decedent liked to "write," "draw," and "mess with old cars and motorcycles." The defendant argues that the admitted testimony was irrelevant in that it was not probative of any fact in issue, and that it was designed to capture the sympathy of the jury.

The test of relevancy of evidence is whether it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1986). "Evidence which is not relevant is not admissible." N.C.G.S. § 8C-1, Rule 402 (1986). The burden is on the party who asserts that evidence was improperly admitted to show both error and that he was prejudiced by its admission. *State v. Agnew*, 294 N.C. 382, 241 S.E. 2d 684, *cert. denied*, 439 U.S. 830, 58 L.Ed. 2d 124 (1978). The admission of evidence which is technically inadmissible will be treated as harmless unless prejudice is shown such that a different result likely would have ensued had the evidence been excluded. *State v. Billups*, 301 N.C. 607, 272 S.E. 2d 842 (1981); *State v. Cross*, 293 N.C. 296, 302, 237 S.E. 2d 734, 739 (1977); N.C.G.S. § 15A-1443(a) (1983).

Although we conclude that the testimony in question was irrelevant to the issues in the case and should not have been admitted into evidence, the defendant has not carried his burden of showing such prejudice as would require a new trial. Plenary eyewitness testimony identified the defendant as having shot and killed the unarmed deceased without provocation. We therefore hold that the admission of the testimony into evidence was harmless error, as it is not likely that it affected the result of the trial. This assignment of error is overruled.

[3] By his next assignment of error, the defendant contends that the trial court erred in six instances by allowing the prosecutor to cross examine character witnesses for the defendant concerning specific acts of misconduct by the defendant. We initially point out that the defendant failed to object to four of the questions asked by the prosecutor about which he now complains. Therefore, review on appeal of those questions is limited to consideration of whether the questions constituted plain error. *See State v. Ramey*, 318 N.C. 457, 349 S.E. 2d 566 (1986); *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983).

After the character witnesses testified concerning the defendant's reputation for peacefulness, the prosecutor asked the witnesses on cross examination whether they had heard or knew about certain instances including acts of domestic cruelty and rowdy and abusive conduct by the defendant when he was drinking. These questions were permissible under our Rules of Evidence.

It has long been established that a defendant in a criminal case is entitled to introduce evidence of his own good character as substantive evidence in his favor. 1 Brandis on North Carolina Evidence § 104 (1982 and Cum. Supp. 1986); *State v. Peek*, 313 N.C. 266, 273, 328 S.E. 2d 249, 254 (1985); *State v. Denny*, 294 N.C. 294, 297, 240 S.E. 2d 437, 439 (1978). However "[i]f the accused thus 'puts his character in issue,' the State in rebuttal may introduce evidence of his bad character . . . ." 1 Brandis on North Carolina Evidence § 104 (1982 and Cum. Supp. 1986); N.C.G.S. § 15A-1226(a) (1983).

With the enactment of the North Carolina Rules of Evidence, effective 1 July 1984, this practice remained intact as codified in Rule 404, except that subdivision (a)(1) limits the admission of evidence of the character of the accused to that relating to "a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same . . . ." Specifically, Rule 404 provides in pertinent part that:

> Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes.
>
> (a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> (1) *Character of accused.*—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same . . . .

N.C.G.S. § 8C-1, Rule 404 (1986).

Further, Rule 405 prescribes allowable methods of proving character as follows:

> Rule 405. Methods of proving character.

(a) *Reputation or opinion.*—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. *On cross-examination, inquiry is allowable into relevant specific instances of conduct.* Expert testimony on character or a trait of character is not admissible as circumstantial evidence of behavior.

(b) *Specific instances of conduct.*—In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

N.C.G.S. § 8C-1, Rule 405 (1986) (emphasis added). We note that the second sentence of subsection (a) of Rule 405 represents a departure from prior case law, in that it allows a witness who has given character evidence for the defendant to be cross examined by the State about relevant specific instances of the defendant's conduct. By enacting this sentence of the rule, the legislature adopted the practice applied in "most jurisdictions." 1 Brandis on North Carolina Evidence § 115, n. 4 (1982) (citing *Wigmore on Evidence* (Chadbourn rev. § 988)). Prior case law applying the former rule that prohibited the use of specific instances of misconduct to test a character witness's knowledge of the character and reputation of the person about whom he was testifying is no longer authoritative or binding in that regard. *See generally,* 1 Brandis on North Carolina Evidence §§ 111 and 115 (1982 and Cum. Supp. 1986) (discussing former rule).

In the present case, the defendant put his character in issue by having witnesses testify concerning his reputation for peacefulness, a "pertinent trait of his character." Only then did the prosecutor, in accordance with Rules 401(a)(1) and 405(a), cross examine the witnesses about specific instances of conduct by the defendant, in an effort to rebut their prior testimony as to the defendant's character for peacefulness. In this particular context, the answers to the prosecutor's questions were properly admitted. This assignment of error is overruled.

[4] The defendant also assigns as error the trial court's failure to instruct the jury on self-defense and voluntary manslaughter based on imperfect self-defense. A defendant is entitled to an instruction on perfect self-defense as an excuse for a killing when

evidence is presented tending to show that, at the time of the killing:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

> (3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

> (4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Wallace*, 309 N.C. 141, 147, 305 S.E. 2d 548, 552-53 (1983) (quoting *State v. Bush*, 307 N.C. 152, 158, 297 S.E. 2d 563, 568 (1982)). A defendant is entitled to an instruction on imperfect self-defense only if the first two elements of perfect self-defense are shown to exist. *State v. Bush*, 307 N.C. 152, 159, 297 S.E. 2d 563, 568 (1982). In determining whether there was any evidence of self-defense presented, the evidence must be interpreted in the light most favorable to the defendant. *State v. McCray*, 312 N.C. 519, 324 S.E. 2d 606 (1985); *State v. Watkins*, 283 N.C. 504, 196 S.E. 2d 750 (1973).

The defendant's evidence at trial in the present case tended to show that when he came out of the bar at closing time on the night in question, he saw two men standing beside his truck. The defendant testified that it looked as if one of the men was either urinating on his truck or reaching down to take something out of it. As the defendant approached, yelling at the two men, they moved across the street. The defendant testified that "the one they called Monjure, said something about, 'If you'll come on over here, we'll whip your old ass.'" Then they began to run away. The defendant further testified that not knowing what the men were going to do, he got his rifle from his truck and followed them across the street. The defendant was "cussing and raising

hell at Crawford" when Monjure walked around the vehicle beside which he stood.

The defendant testified as follows:

> I told him to stop where he was and—ah—he told me something about—said, Well, we didn't steal nothing, and Crawford said that they would—he was just taking a leak beside the tree, and I told him—I said, you weren't looking at the tree. I said, You mean to tell me that you were pissing on my truck? And he said, No, no, no, sir. He said, I was just going to the bathroom beside the truck. And—ah—Monjure said something about, "If you think we have got anything, go ahead and call the law. We didn't get nothing out of it," and—ah—two people had followed me, had got there after I did, and that was Calvin and McLaurin, and they were trying to calm me down and talk to me and tell me it weren't worth it, that they were just running their mouth and didn't mean nothing by what they said, and they didn't think that they had gotten nothing out of the truck, and that if they went to the bathroom on it, it would wash off. And at that point, I said, Well, just might do that, and as far as I was concerned, it was over, and I turned to leave.

The defendant further testified that as he turned to leave, he saw the other soldiers, of whose presence he was not previously aware, and

> I was saying, "What in the hell are all of y'all doing here," somebody said something about they had something for me, and when I turned and looked, the first person I saw was Buchannon [sic], he was the closest one to me, and he had his hands up behind his back in a parade rest type stance, and when I turned and looked at him, he spread his legs apart a little bit and he was just standing there, and I said, "What did you say?" And he said, taking a break. And so, I told him, I said, Well, I have got to see what is behind your back. I said, Let me see your hands. . . .
>
> And at that time he moved—his arms were up . . . behind his back, his elbows were bent and he didn't have them dropped down straight behind him, they were up . . . and at that time, when he made—when he made a little sud-

> den move, he just didn't ease his hands out . . . and start to move his hands out, his body moved with his arms, and at that time, I saw a long white-looking stick. I figured it was a pick handle or a—ah—ah—axe handle. I just saw the white part of a stick coming out from behind him. I don't know whether I saw it between his legs the way his legs were before it got out from beside his leg or whether it was outside of his leg that I saw it, and when he did that, I kind of jumped like that and picked the gun up with one hand and it went off.

The defendant specifically testified that he thought that Buchanon was going to hit him and that it scared him, but that *he did not intend to shoot Buchanon.*

The evidence, when viewed in the light most favorable to the defendant, indicates that he was the aggressor during the entire incident. The defendant himself testified that the men ran away from his truck. Thereafter, the defendant went to the truck, got his rifle and followed them across the street. Further, there was no evidence of necessity—real or apparent—for the defendant to kill in order to protect himself from death or great bodily harm at the time in question. Although the defendant testified that he saw a "long white-looking stick" behind the decedent's back, there was no evidence tending to indicate that an attack by the decedent was imminent. To the contrary, the evidence was that the soldiers made great efforts to convince the defendant that they had meant no harm to his truck and that he should call the police if he doubted them. Further, there is evidence that the defendant told his acquaintances when they tried to persuade him to leave before the shooting: "No, this would be self defense."

More importantly, no evidence tended to show that the defendant *in fact* formed a belief that it was necessary to kill the victim to protect himself from death or great bodily harm. Even taking the defendant's own testimony in the light most favorable to him, the defendant's evidence tended unequivocally to show that the killing was an accident, and that he had not formed either a belief that it was necessary to kill the victim or an intent to kill him in order to protect himself from death or great bodily harm. Where, as here, there is no evidence to support a reasonable jury finding that the defendant *in fact* believed it

necessary to kill his adversary to protect himself from death or great bodily harm, the defendant is not entitled to an instruction on either perfect or imperfect self-defense. *State v. Bush*, 307 N.C. 152, 160, 297 S.E. 2d 563, 569 (1982). Counsel for the defendant seems to have recognized this at trial in stating to the trial court: "[w]e have never relied upon self-defense in this case. We have relied on accident from the beginning . . . ."

We conclude as a matter of law that there was no evidence of either perfect or imperfect self-defense presented in the present case. Therefore, the trial court did not err in failing to instruct the jury on self-defense.

Similarly, there was no evidence to support an instruction on voluntary manslaughter. Generally, "voluntary manslaughter is an intentional killing without premeditation, deliberation or malice but done in the heat of passion suddenly aroused by adequate provocation or in the exercise of imperfect self-defense where excessive force under the circumstances was used or where the defendant is the aggressor." *State v. Wallace*, 309 N.C. 141, 149, 305 S.E. 2d 548, 553 (1983). The defendant does not argue that he killed the deceased in the heat of passion suddenly aroused by adequate provocation. Instead, he argues that he was entitled to an instruction on voluntary manslaughter because the jury reasonably could have found his actions to be the result of imperfect self-defense. In order for an instruction on voluntary manslaughter based on imperfect self-defense to be required, the first two elements of perfect self-defense must be shown to exist. *See generally, State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982). As we have pointed out, the evidence did not tend to indicate that the defendant did *in fact* form a belief that it was necessary to kill the deceased, and there was no evidence tending to show that such a belief would have been reasonable under the circumstances. Therefore, there was no evidence of imperfect self-defense and no basis upon which the jury reasonably could have found the defendant guilty of voluntary manslaughter. He was not entitled to a jury instruction on voluntary manslaughter. We find no error in the jury instructions.

[5]  As his last assignment of error, the defendant contends that the trial court erred in denying his motion under N.C.G.S. § 15A-1415(b)(6) for a new trial based on newly discovered evidence. The

statute provides that a defendant by motion may seek appropriate relief when:

> [e]vidence is available which was unknown or unavailable to the defendant at the time of the trial, which could not with due diligence have been discovered or made available at that time, and which has a direct and material bearing upon the guilt or innocence of the defendant.

N.C.G.S. § 15A-1415(b)(6) (1983).

In order for a new trial to be granted on the ground of such newly discovered evidence under the statute, the following must be shown: (1) the witness or witnesses will give newly discovered evidence; (2) such newly discovered evidence is probably true; (3) the new evidence is competent, material and relevant; (4) due diligence was used and proper means were employed to procure the testimony at the trial; (5) the newly discovered evidence is not merely cumulative; (6) it does not tend only to contradict a former witness or to impeach or discredit him; (7) it is of such a nature as to show that a different result would probably be reached at a new trial. *See State v. Cronin*, 299 N.C. 229, 262 S.E. 2d 277 (1980); *State v. Parson*, 298 N.C. 765, 259 S.E. 2d 867 (1979). Such a motion is addressed to the sound discretion of the trial judge and in the absence of abuse of discretion is not reviewable on appeal. *Id.*; *State v. Britt*, 285 N.C. 256, 204 S.E. 2d 817 (1974).

Through an affidavit of the defendant's attorney and testimony at the hearing on the motion, evidence was introduced tending to show that in December, 1985, the defendant's attorney sent him to the Cliffdale Clinic to be examined by Dr. Robert G. Crummie, a psychiatrist and the Medical Director of the clinic. As a result of his evaluation of the defendant, Dr. Crummie prepared a report in which he stated that he felt that the defendant is generally a gentle person, except when he is drinking, at which times he is probably very dangerous. He stated that the defendant drinks excessively, but otherwise did not mention in his report any emotional disturbance that might have existed at the time of the murder. Dr. Crummie did, however, state in his report that the defendant spent one year in Vietnam which was "relatively stressful" for him.

After the verdict, the defendant's attorney contacted the Cliffdale Clinic in an effort to get Dr. Crummie to testify, for pur-

poses of sentencing, concerning the defendant's possible rehabili-
tation. Because Dr. Crummie was unable to appear, he suggested
that the defendant's attorney contact Rick Ryckman or Ron Friar,
psychotherapists at the clinic who had talked with the defendant
in conjunction with Dr. Crummie's evaluation. Upon discussion
with Mr. Ryckman, the defendant's attorney learned for the first
time that Mr. Ryckman and Dr. Friar had discussed the possibili-
ty that the defendant suffered from Post Traumatic Stress Dis-
order.

Mr. Ryckman testified that in his position at the clinic, he is
required to be supervised by a licensed practicing psychologist or
psychiatrist, and that Dr. Crummie is his supervisor. He further
testified that he administered two psychological tests to the de-
fendant and then interviewed him for approximately fifteen min-
utes. Mr. Ryckman prepared a report which he submitted to Dr.
Crummie. In this report, he stated that "there appears to be some
possible mitigating factors with regard to [the defendant's] . . .
recent behavior. These could be associated with Vietnam War
Syndrome (Post Traumatic Stress Disorder, Chronic, delayed)."
He discussed this with Dr. Crummie. Mr. Ryckman testified, ex-
plaining that he is of the opinion that:

> [T]here was significant impairment in Larry Gappins at the
> time of the commission of the alleged offense. . . . The post-
> traumatic stress disorder is a contributing factor and is exac-
> erbated by the use of alcohol. Specifically, when Mr. Gappins
> drinks, his judgment becomes extremely poor and he be-
> comes violent, often incurring flashbacks to the Vietnam War
> experiences.

Dr. Friar testified that while interviewing the defendant, Mr.
Ryckman called him in to listen to the defendant recount some of
his Vietnam experiences. Based upon one such experience related
by the defendant, Dr. Friar concluded that the defendant "may
well have post-traumatic stress disorder." However, he suggested
that further testing would be required and that his conclusion
could prove to be wrong in later diagnosis.

The defendant argues that the trial court abused its discre-
tion in failing to find that this evidence is probably true, that it is
not merely cumulative, and that it is of such a nature that a dif-
ferent result would probably be reached in the guilt determina-

tion phase at a new trial. We do not agree. The opinions of the two witnesses were related to their supervisor Dr. Crummie after their interview with the defendant. Dr. Crummie apparently ruled them out in making his evaluation of the defendant's mental health, because he did not adopt them or incorporate them in his report in which he specifically noted the defendant's tour in Vietnam and assessed it as "relatively stressful." We therefore conclude that the trial court did not err. This assignment of error is overruled.

For reasons stated herein, we hold that the defendant received a fair trial free from prejudicial error.

No error.