STATE OF NORTH CAROLINA v. DEMONTRE ANTHONY SAMUEL

No. COA09-1230

(Filed 4 May 2010)

**Evidence— guns—plain error to admit—relevancy**

The trial court committed plain error in a double robbery with a dangerous weapon and assault with a deadly weapon case by admitting evidence of guns found in defendant's home. The guns were not relevant to the crimes charged because the victims' description of the gun used in the attack did not match either of the guns found in the closet, and neither witness identified either gun as the one used in the robbery.

Appeal by Defendant from judgments entered 2 October 2008 by Judge Henry W. Hight in Durham County Superior Court. Heard in the Court of Appeals 22 February 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Alexandra M. Hightower, for the State.*

*Michele Goldman for Defendant.*

STEPHENS, Judge.

*I. Procedural History*

On 21 April 2008, Defendant Demontre Anthony Samuel was indicted on two counts of robbery with a dangerous weapon and one count of assault with a deadly weapon. Defendant declined the State's plea offer "to consolidate all the charges for the mitigated range for robbery with a dangerous weapon[,]" and the State withdrew the offer on 4 August 2008.

The matter was tried before a jury during the 29 September 2008 criminal session of Durham County Superior Court. The jury found

Defendant guilty on both counts of robbery with a dangerous weapon and the lesser included offense of simple assault. The trial court entered judgment upon the jury verdicts, sentencing Defendant to a prison term of 60 to 81 months for the first robbery conviction and the simple assault conviction and a consecutive prison term of 60 to 81 months for the second robbery conviction.[1] Defendant gave notice of appeal in open court.

## II. Evidence

At trial, the evidence tended to show the following: On 23 February 2008, Larry Johnson ("Larry") and his cousin Archie Poteat ("Archie") left the Northgate Mall in Durham, North Carolina and went to the bus stop. In a written statement given to police after the incident at issue, Larry stated:

> We were waiting for the bus and this guy walked up on me[,] pulled out a gun and said give me your chain[.] I said no and he hit me in the head with the gun, and took the chain off my neck. [H]e then pointed the gun at my cousin and took his [chain]. [H]e then walked back to where he was with his friends and me and my cousin walked to the store and called my mother. She called the police and we described to them what he looked like. I told them he was a heavy set guy, dark skin, short hair, he had on a black shirt, blue jeans. The gun was a smokey [sic] grey gun[. I] think it was a 9 [millimeter] pistol because it was a kinda big pistol.

Archie testified to the same sequence of events that Larry described in his written statement. Archie could not describe in detail what the assailant looked like, although Archie estimated that the assailant was about six feet tall and noticed that "[h]e was built. He wasn't fat. He was just built." Archie testified that the assailant was wearing "a black shirt, blue jeans, and black sneakers."

Larry testified at trial that one of his friends, Lynnette Paul ("Lynnette"), called him the day after the incident and told him that Defendant was the one who had robbed him. Larry told his mother about Lynnette's call. He also called Detective Richard Clayton ("Clayton") of the Durham City Police Department and reported what Lynnette had said.

---

1. Although the trial court announced in open court that Defendant was sentenced to 30 days in prison for the simple assault conviction, and that such sentence was to run consecutively with the 60 to 81 month sentence for the first robbery conviction and the simple assault conviction shows only one sentence of 60 to 81 months for both convictions.

Based on the information given to Larry by Lynnette, Clayton called Larry down to the station so that Larry "could identify who did it[.]" Larry went to the police station with his sister, who went to school with Lynnette at the time, and his mother. Clayton asked Larry if he could identify who had committed the crimes against Larry and Archie, and Larry indicated that he could. Detective J.R. Salmon ("Salmon") of the Durham City Police Department showed Larry a six-person photo array, one picture at a time. When Larry went through the array the first time, he did not pick out a photograph. According to Salmon, however, Larry hesitated when he looked at the fifth photograph. Salmon showed the photo array to Larry a second time. Although Larry did not pick out a photograph, according to Salmon, "[w]hen we got to photo number five, he looked at the picture for approximately 20 seconds, and he made a face and said, no, that's not him." Salmon further testified, "Then I went out and spoke with Investigator Clayton because I felt that the victim was nervous and recognized the gentleman, but was not willing to testify or give that information." Clayton "decided it would be best to get [Larry's mother] involved for moral support[,]" so Clayton and Larry's mother went into the room and talked with Larry for about five minutes. Then Clayton "came back out of the room and asked [Salmon] to go back in and show [Larry] the photo array one more time." This time, "[a]t photo number five, [Larry] picked [Defendant] out and pointed to him and said, [']yeah, that's him.[']" Salmon left the interview room after Larry's identification of Defendant and went to Clayton's office. Clayton testified, "I closed the door. I remember a smile on [Salmon's] face. He said, [']he pointed out number five.['] At that time, I knew number five was [Defendant]."

Based on Larry's identification of Defendant in the photo array, Clayton applied for, and was granted, a warrant to search Defendant's residence. On 29 February 2008, Clayton, Salmon and other Durham City police officers went to Defendant's home to execute the search warrant. Defendant was arrested and taken to the police station. Meanwhile, the officers read Defendant's stepfather, David Bracey, the search warrant and interviewed him. Bracey informed Clayton that there were guns upstairs in his bedroom closet. Upstairs in Bracey's closet, Clayton found "a silver—it was a shiny[,] silver semi-automatic, which was [Bracey's] gun that was locked in a safe. Then there was a small silver revolver that was located inside the closet also but not in the safe." Clayton collected the guns as evidence. Clayton testified that the main thing he was looking for, "aside from the weapons, were the chains, direct evidence from the crime or the

robbery that I was unable to locate. So I knew I kind of had to move on with my investigation with that."

After completing the search of Defendant's home, Clayton went to the police station to interview Defendant. Defendant told Clayton that he had been at the mall on 23 February 2008 and had taken pictures with his girlfriend at a photo store in the mall. When he left the mall in the evening, he waited at the bus stop with his brother, Teshaun Johnson ("Teshaun"), his cousin, Shaquille Drakeford ("Shaquille"), and his girlfriend, Lashay Davis ("Lashay"). Defendant told Clayton that he was wearing a black jacket, black t-shirt, black jeans, and black shoes with a yellow and white design on them.

Clayton instructed Salmon to retrieve from the mall the photographs Defendant took with his girlfriend. Salmon went to the mall and located the store where the photographs were taken. Although there were several photographs, Salmon took only one of them. Salmon testified that in the photograph, Defendant was wearing a "black shirt with either [a] yellow or white stripe across the top where the undershirt was." Even though the owners of the store cropped Defendant's girlfriend out of the photograph, the shoulder of another individual, wearing white and yellow stripes, appeared in the photograph to Defendant's right.

Clayton returned to Defendant's house the evening of 29 February 2008 "to verify that [Defendant's] brother Teshuan and his cousin Shaquille [had been] at the bus stop." While at Defendant's house, Clayton did not attempt to collect the clothing Defendant claimed to have been wearing on the night of the robberies. Clayton did, however, interview Teshuan. During the interview, Teshuan gave Clayton one of the chains that had been taken during the robberies. Teshaun gave Clayton a statement indicating where he got the necklace. Based on Teshuan's statement, Clayton set up an interview with Marcus Jackson ("Marcus").

On 3 March 2008, Clayton spoke with Shaquille. Shaquille told Clayton that he had been with Defendant, Teshuan, D'Andre,[2] Preston Scurlock, and Tyrone Peace at the Northgate Mall on 23 February 2008. When the group left the mall, they went to the bus stop to catch the bus home. Shaquille saw Larry and Archie "crossing the street coming towards the bus stop, going behind the bus stop to the wall." While they were waiting at the bus stop, Defendant was seated between D'Andre and Preston under the shed. Shaquille testified, "I

---

2. D'Andre's last name is not included in the record.

seen Marcus come out from behind with two chains. So I asked him if I could have one, and he gave me one." Shaquille testified that Defendant "was still sitting down" when Marcus walked up with the chains. After handing Shaquille the chain, Marcus and his cousin got in Marcus's mother's car and left. Shaquille put the chain around his neck. When the bus pulled up, Shaquille, Defendant, and the rest of their group got on. After he got home, Shaquille "seen that the chain was fake" so he gave it to his youngest cousin, Tyreen.

On cross-examination, Shaquille testified that on the night of the robberies, Defendant was wearing a black t-shirt with a yellow shirt under it, black jeans with a big white design outlined in yellow on the back, and black shoes with yellow and white on them. He identified defense exhibits 2, 3A, and 3B as the pants and shoes Defendant wore on the night of 23 February 2008.

On 14 March 2008, Clayton went to Marcus's house, which is located directly across the street from Defendant's house, and received permission from Marcus's mother to search Marcus's room. Clayton did not locate any evidence associated with the crimes at issue in Marcus's room. Later that day, Clayton met with Marcus at the police station. At that interview, Marcus told Clayton that he had a chain from the robberies at his house but that he had given it to his father. Marcus's father, who had accompanied Marcus to the police station, did not have the chain with him at the interview. Marcus's father left the police station, retrieved the chain from his home, and brought it back to Clayton. The chain had a diamond-studded cross on it and was the chain that had been stolen from Larry.

At trial, Marcus, a six-foot, two-inch, 240-pound, right tackle for his high school football team, acknowledged that he had been at the Northgate Mall bus stop with his cousin on the night of 23 February 2008. Marcus testified that he saw Defendant sitting "[u]nder the shed thing" at the bus stop that evening with about four other people. Marcus further testified that he "really didn't see nothing, actually. I really didn't see nothing." Marcus admitted that several days after the incident, he gave a written statement to police regarding the incident. The trial court sustained Defendant's objection to the prosecutor's attempt to admit Marcus's written statement for the truth of the matter asserted therein. After excusing the jury, the trial court allowed the prosecutor to *voir dire* Marcus to determine if the written statement could be admitted to corroborate his in-court testimony. After the *voir dire*, the trial court ruled that Marcus "can't testify to the

content of the statement, except as to if the [D]efendant gave him the chain. He can testify that that's consistent."

When the jury returned, the prosecutor resumed her examination of Marcus. Marcus testified that he and his cousin weren't at the bus stop longer than five minutes on the night of 23 February 2008 and that his mother came and picked them up. The following exchange then took place:

[Prosecutor:] What did you have in your possession when you left that bus stop?

[Marcus:] Nothing.

[Prosecutor:] Nothing? What, if anything, did [Defendant] give you?

. . . .

[Marcus:] Nothing.

. . . .

[Prosecutor:] He never gave you anything?

[Marcus:] The same night?

[Prosecutor:] Yes.

[Marcus:] No.

[Prosecutor:] What did he give you when?

. . . .

[Marcus:] When what?

. . . .

[Prosecutor:] Did he give you anything? You know him so well. Did he give you anything during the course of you knowing him?

. . . .

[Marcus:] No.

. . . .

[Prosecutor:] He didn't give you anything?

[Marcus:] No, not to my knowledge.

[Prosecutor:] He never gave you a chain?

. . . .

[Marcus:]  No.

[Prosecutor:]  He never gave you a chain?

[Marcus:]  I got the chain from another boy when we was like at the corner of my neighborhood.

[Prosecutor:]  From whom did you get the chain?

[Marcus:]  I don't even remember. . . .

After a brief bench conference, the jury was recessed for lunch. The prosecutor asked that the record reflect that Marcus made several statements during *voir dire* and "then turned around and made inconsistent statements on the record when we came back in with the jury."

Immediately after the lunch recess, the jury was excused again. The trial court warned Marcus, "You've made an inconsistent statement under oath in this courtroom under oath. I just want to advise you [of] the penalties of perjury . . . . I think it's a Class F. . . . [T]he maximum sentence you could receive for a Class F felony would be 20 months."

When the jury returned to the courtroom, the prosecutor asked Marcus, "Did you receive a necklace?" Marcus responded, "Yes." When asked from whom he received it, Marcus replied that he received it from Defendant.

After Marcus left the witness stand, the State recalled Larry, who had identified Defendant both in the photographic line-up and in court as the assailant. Larry testified that he had never seen Marcus before and that Marcus was not his assailant.

Lynnette testified that she told Clayton she had witnessed the robberies. However, Lynnette admitted at trial that she did not witness the robberies and she was not, in fact, at the bus stop with Larry and Archie on the night they were robbed. Instead, she "was at a different bus stop . . . on the other side of the mall." The prosecutor asked Lynnette, "What do you recall happening on [23 February 2008] at that bus stop?" Lynnette responded, "I don't—all I know, they was at a different bus stop." Lynnette further testified that she heard about the robbery when she got a phone call from Larry. Larry told Lynnette that his assailant was wearing a black shirt, blue jeans, and black sneakers. Lynnette did not recall Larry describing any physical characteristics of his assailant. The prosecutor then asked, "When Larry described the person who robbed him, what, if anything, did

you say to Larry?" Lynnette replied, "I said [Defendant's] name." Lynnette testified that she and Defendant went to school together and that she had seen him at the mall that evening wearing a "[b]lack shirt, blue jeans, and black sneakers." She also testified that she got on the "number one" bus and then, after a while, Defendant got on the bus with "the people he was with." Lynnette recalled that Defendant was wearing a "[b]lack [t]-shirt, blue pants, and black sneakers" when he got on the bus. She did not remember any stripes, markings, or other colors on Defendant's clothes. Lynnette further testified that she saw Larry's chain in Defendant's hand. Although both Shaquille and Marcus testified that Marcus was picked up at the bus stop by his mother on the night of the robberies, Lynnette testified that Marcus was also on the bus.

Defendant called his mother, Khadedre Drakeford, to testify on his behalf. Ms. Drakeford recognized Defendant's Exhibits Numbers 2 and 3 as the clothes Defendant wore to the mall on the evening of 23 February 2008. She testified that she bought the clothes with Defendant in Raleigh on the afternoon of 23 February because Defendant was going to the mall to take pictures with his girlfriend, "and they wanted to match." Ms. Drakeford drove Defendant to the Northgate Mall that evening, and "[h]e caught the bus back." Ms. Drakeford was awake when Defendant came home from the mall, and she testified that he was wearing the same clothes they had purchased that day and that he wore to the mall that evening, "[b]lack [t]-shirt, yellow [t]-shirt up under it, those black jeans with the white stripe down the back, [and] yellow and black sneakers."

On cross-examination, Ms. Drakeford acknowledged that she had spoken to Clayton about the revolver found in Bracey's bedroom closet. Over objection, she testified that she informed Clayton that she found the revolver on 25 February 2008 in an upstairs bedroom on a top bunk. When Ms. Drakeford asked Defendant if the revolver was his, he told her it was not. Over further objection, Ms. Drakeford testified that she "took the gun and put it in the closet to take it to an officer that lives down the street from me." Ms. Drakeford testified, again over objection, that she had never known Defendant to carry a gun. The prosecutor then asked, "So two days after [the incident at issue], you found a weapon in the bedroom and you talked to [Defendant] about it?" Ms. Drakeford replied, "Yes, I did." When asked who Defendant said the gun belonged to, over objection, Ms. Drakeford testified that Defendant "said the young man's name was Michael. I am familiar with that young man. His last name is Fuller."

The prosecutor then asked, "So [Defendant] hangs around guys with guns?" Ms. Drakeford responded, "No." Defendant's objection was again overruled.

### III. Discussion

Defendant first argues that the trial court erred in admitting evidence of the guns found in Defendant's home as the guns were not relevant to the crimes charged. We agree.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2007). "Evidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2007). Although "a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *cert. denied*, 506 U.S. 915, 121 L. Ed. 2d 241 (1992).

Where a defendant has made a timely objection at trial, "[t]he admission of evidence which is technically inadmissible will be treated as harmless unless prejudice is shown[.]" *State v. Gappins*, 320 N.C. 64, 68, 357 S.E.2d 654, 657 (1987). "A defendant is prejudiced . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2007). Where a defendant has failed to make a timely objection at trial, the admission of evidence which is technically inadmissible will be treated as harmless unless plain error is shown. Plain error occurs when an error " 'had a probable impact on the jury's finding that the defendant was guilty.' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982) (footnote omitted)).

In his pre-trial statement to police, Larry described the gun used in the attack against him as "a smokey [sic] grey gun[. I] think it was a 9 [millimeter] pistol because it was a kinda big pistol." At trial, Larry testified regarding the gun as follows:

[Larry:] It was a pretty big gun. It was a smokey [sic] gray color.

[Prosecutor:] Smokey [sic] gray?

[Larry:] Yes.

[Prosecutor:] Are you familiar with weapons?

[Larry:] A little bit.

[Prosecutor:] Can you distinguish between a revolver and a semi-automatic?

[Larry:] Yes.

[Prosecutor:] Which type of weapon was pointed at you?

[Larry:] A semi-automatic.

Archie testified regarding the gun used in the attack as follows: "It was a long gun. A smokey [sic]—it was smokey [sic] gray, pointed at me."

Clayton testified that he found "a silver—it was a shiny[,] silver semi-automatic, which was [Bracey's] gun that was locked in a safe. Then there was a small silver revolver that was located inside the closet also but not in the safe."

Clayton testified further:

I made a determination, due to my prior interviews with both victims, I asked them to describe the weapons, the gun that was displayed. Both victims, Larry and Archie, indicated that it was a silver, like a smokey [sic] gray, large semi-automatic handgun.

I ensured that they knew the difference between a revolver and a semi-automatic. Both victims indicated it was a semi-automatic.

The weapon that I recovered at [Defendant's] residence, aside from the semi-automatic [sic], was a silver shiny semi-automatic that was owned by his stepfather. Aside from that, another weapon which was a small, gray revolver was located. So I made the determination that that was not the weapon that was used in the robbery.

Salmon identified State's Exhibit Number 16, the revolver, as "one of the two guns that was taken out of the residence out of the stepfather's room[.]"[3] Salmon identified State's Exhibit Number 17, the

3. On appeal, the State mistakenly asserts that it

presented evidence that three, not two, handguns were found, two of which were semi-automatic weapons, as was the weapon used to rob the victims. Only one gun, a revolver, was identified by a witness as probably not being the weapon used in the robbery.

semi-automatic, as "the second handgun that was recovered in the house." On cross-examination, Salmon testified that the second gun was found upstairs in a locked safe.

Officer Catherine M. Lipsey of the Durham Police Department photographed the guns and placed them in brown paper bags. Lipsey identified State's Exhibit Number 22 as "a photograph I took of the weapon."[4] Over objection, Lipsey identified State's Exhibit Number 16 as "the handgun that I took out of the closet on the top shelf." The exhibit was admitted into evidence, over objection. Lipsey identified State's Exhibit Number 17 as "the gun that . . . I took out of the safe." Over objection, the exhibit was admitted into evidence.

On cross-examination, Lipsey explained that she did not collect "any kind of tissue or blood" from either gun and that if there had been any, she "would have collected it, or . . . taken the handgun and driven it down to the SBI labs" for testing. Clayton testified that only the revolver was swabbed for DNA and that no fingerprints were taken from the revolver.

On cross-examination, over Defendant's repeated objection to the relevance of the line of questioning, the prosecutor questioned Ms. Drakeford about the revolver. Ms. Drakeford testified that she found the revolver on 25 February 2008 in an upstairs bedroom on a top bunk and talked to Defendant about it. The prosecutor asked, "So two days after [the incident at issue], you found a weapon in the bedroom and you talked to [Defendant] about it?" Ms. Drakeford replied, "Yes, I did." Ms. Drakeford "took the gun and put it in the closet [.]" She further testified that Defendant denied that the revolver was his. When asked who Defendant said the gun belonged to, Ms. Drakeford testified that Defendant "said the young man's name was Michael. I am familiar with that young man. His last name is Fuller." The prosecutor then asked, "So [Defendant] hangs around guys with guns?" Ms. Drakeford responded, "No."

In her closing argument to the jury, the prosecutor projected a slide of an enlarged photograph of the revolver. While the image appeared, the prosecutor narrated: "On 29th of 2008, February, search warrant was issued. It was executed at the [D]efendant's home. Gun was found . . . ."

---

On the contrary, it is abundantly clear from the record that only two guns were found in Bracey's closet and admitted into evidence.

4. State's Exhibit Number 22 is a photograph of the revolver.

The victims' description of the gun used in the attack did not match either of the guns found in Bracey's closet.[5] Furthermore, neither witness identified either gun as the gun used in the robbery. After Clayton "ensured that [the victims] knew the difference between a revolver and a semi-automatic[,]" he "made the determination that [the revolver] was not the weapon that was used in the robbery." Despite this determination, the revolver was the only weapon from which a DNA swab was taken, Defendant's mother was questioned solely about the revolver, and the revolver was presented to the jury by the prosecutor in her closing argument, along with the misleading narrative, "Gun was found." Moreover, although the assailant used the gun to hit Larry just above the eyebrow, opening up a bloody gash, no tissue or blood was collected from either gun.

In sum, there was not a scintilla of evidence linking either of the guns to the crimes charged.[6] Accordingly, we conclude that the evidence about the guns was wholly irrelevant and, thus, inadmissible. See N.C. Gen. Stat. § 8C-1, Rule 402.

Having determined that the evidence of the guns was irrelevant and, thus, inadmissible, we must now determine whether Defendant is entitled to a new trial because of the error.

The State contends that the admission of the evidence is limited to plain error review as Defendant "did not timely object to . . . the admission of the guns into evidence[.]"[7] However, the transcript of the proceedings unequivocally establishes that Defendant timely objected to the admission of both guns, and that both objections were overruled by the trial court. The State also intimates that Defendant somehow waived his objection to the evidence by "examin[ing] various witnesses at length in regard to the three [sic] handguns found."[8]

---

5. Although Clayton testified that "[b]oth victims . . . indicated that [the gun] was a silver, like a smokey [sic] gray, large semi-automatic handgun[,]" neither victim described the gun as "silver" and, instead, consistently described the gun's color as "smokey [sic] gray."

6. While the State could possibly have advanced a theory that the "silver" semi-automatic gun found in Bracey's locked safe was the "smoky gray" semi-automatic gun used in the attacks, no evidence was presented to support this theory and the State, instead, focused solely on the revolver in its attempt to link Defendant to the crimes charged.

7. The State contradicts itself two pages later when it asserts that "Defendant's only objection [to the guns] came when the State introduced Exhibits 16[, the revolver,] and 17[, the semi-automatic,] into evidence."

8. As explained supra, the State introduced evidence of two guns at trial. The State's brief to this Court contending that three guns were found profoundly misstates the evidence.

**STATE v. SAMUEL**

[203 N.C. App. 610 (2010)]

However, the State cites no legal authority for this proposition, and our research has revealed none.[9] The State further contends that the admission of the evidence is limited to plain error review as Defendant "did not timely object to many references to the evidence" of the guns.[10] Even assuming *ar-guendo* that a plain error standard of prejudice applies, we conclude that it was plain error to admit any evidence of the guns.

The sole issue in contention at the trial of this case was the identity of the individual who robbed Larry and Archie. The State used the evidence of the guns, and most specifically the revolver, to tie Defendant to the crime. Although the evidence before the trial court was that the revolver was *not* the gun used in the crime, the prosecutor's case relied upon tying Defendant to the revolver and then tying the revolver to the crime. The prosecutor's cross-examination of Defendant's mother connected Defendant to the revolver within days of the robbery. The prosecutor published a photograph of the revolver to the jury during the trial. The prosecutor further highlighted the revolver as an important link between Defendant and the crime in her closing argument to the jury by projecting an enlarged image of the revolver while narrating, "Gun was found." There is no tenable argument that the admission of the evidence of the guns, and the prosecutor's reliance upon the revolver to link Defendant to the crimes charged, did not have "a probable impact on the jury's finding that the defendant was guilty." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (citation and quotation marks omitted). We disagree with the State's unsupported assertion that "[g]iven the substantial evidence of guilt in the record, Defendant cannot meet th[e] burden" of showing plain error. We agree with Defendant that there "is not, by any fair characterization, overwhelming evidence that [Defendant] was the robber[,]" demonstrated as follows:

The evidence indicates that Defendant was initially identified as the assailant by Lynnette. While Lynnette told Clayton that she was an eyewitness to the robberies, she admitted on the stand that

9. Indeed, we find shocking the suggestion that a party is prohibited from testing the sufficiency or credibility of evidence admitted over that party's objection.

10. While a defendant's failure to object to the improper admission of evidence is generally limited to plain error review on appeal, this Court is mindful of the reluctance of counsel to repeatedly interrupt his adversary in order to repeatedly object to the admission of the same evidence for fear of incurring jury and/or judicial disfavor and drawing extra attention to the evidence being objected to. *See State v. Jones*, 355 N.C. 117, 129, 558 S.E.2d 97, 105 (2002) ("[T]his Court is mindful of the reluctance of counsel to interrupt his adversary and object during the course of closing argument for fear of incurring jury disfavor.").

she did not witness the crimes and, furthermore, that she was not even at the bus stop where the crimes were committed at the time they were committed.

Based on the false information given to Larry by Lynnette, Clayton called Larry down to the station so that Larry "could identify who did it[.]" Larry was shown a photo array created by Clayton containing Defendant's picture. Larry did not identify his assailant the first two times he viewed the array. Believing that Larry had "paused" at picture number five, Defendant's picture, Salmon left the room to talk with Clayton. Clayton and Larry's mother then entered the room to lend "moral support" to Larry. After talking with Larry for five minutes, Clayton and Larry's mother left the room, and Salmon again showed the photo array to Larry. This time, Larry identified Defendant as the assailant. Salmon went to Clayton's room with a "smile on his face" to tell Clayton that Larry had identified Defendant in the photo array.

Based on this questionable identification, Clayton obtained a search warrant for Defendant's home. As a result of the search, the two handguns were found. As discussed *supra*, there was not a scintilla of evidence linking either of the guns to the crimes charged.

At trial, Marcus testified that he had been given the chain by someone other than Defendant. Before allowing Marcus to continue testifying, the trial court told Marcus that he had "made an inconsistent statement under oath in this courtroom" and warned him of the penalties for perjury. Marcus then testified that Defendant had given him the chain.

Archie testified that his assailant "was built. He wasn't fat. He was just built." Larry described his attacker as "heavy set[.]" Clayton testified at trial that he did not consider Defendant "heavy set," and conceded that Marcus, a six-foot, two-inch, 240-pound, right tackle for his high school football team, is "pretty big and tall and heavy set[.]" Clayton further testified, "It's hard to mistake a—I mean, Marcus is a big boy."

Shaquille, who was at the bus stop on the night of the robberies, testified that Defendant never left the bus stop bench and that Marcus appeared at the bus stop with the stolen chains. Larry and Archie both testified that their assailant was wearing a black shirt, blue jeans, and black sneakers.[11] However, Defendant was wearing a dis-

11. Clayton's testimony illustrates that a black shirt, blue jeans, and black sneakers is a common outfit among Durham youth and relatively unhelpful as an identifying factor.

tinctive bright yellow t-shirt under his black shirt, which was plainly visible in the photograph Salmon retrieved from the mall, and his black pants and black shoes had unique yellow and white designs on them. Furthermore, neither of the chains were discovered in Defendant's possession.

Given the weakness in the State's evidence that Defendant was the assailant and the substantial evidence tending to show that Defendant was not the assailant, we conclude that the admission of the evidence of the guns, and the prosecutor's reliance upon the revolver to link Defendant to the crimes charged, had "a probable impact on the jury's finding that the defendant was guilty." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (citation and quotation marks omitted). Accordingly, we hold that the admission of the irrelevant gun evidence amounted to plain error, for which Defendant is entitled to a new trial.

In light of this conclusion, we need not reach Defendant's remaining arguments. For the foregoing reasons, Defendant's convictions are reversed and this matter is remanded to Durham County Superior Court for a new trial.

NEW TRIAL.

Chief Judge MARTIN concurs.

Judge WYNN concurs in the result with a separate opinion.

WYNN, Judge, concurring.

In North Carolina, it is error in a trial for armed robbery to admit evidence of a gun that is in no way linked to the crime charged. Additionally, such error warrants a new trial where there is conflicting evidence of the identity of the perpetrator.[12] While I would hold in this case that the semi-automatic pistol was properly admitted as evidence, I agree with the majority that admitting the revolver was prejudicial error. Thus, I concur in awarding Defendant a new trial.

On 23 February 2008, while waiting at a bus stop at the mall, Larry Johnson and Archie Poteat were robbed of their neck chains, and Larry Johnson was struck in the face, by a heavyset man with a gun. The assailant, later identified as Defendant, was described by both young men as brandishing a gray semi-automatic pistol.

12. *State v. Patterson*, 59 N.C. App. 650, 653, 297 S.E.2d 628, 630 (1982).

The same evening, Larry Johnson described his assailant to a friend, Lynnette Paul. She testified that the clothes she saw Defendant wearing on that day were consistent with the description Larry Johnson provided. She testified that she observed Defendant and his companions on the bus playing with a chain that she recognized as belonging to Larry Johnson. Larry Johnson subsequently picked Defendant out of a photo lineup assembled by the detective investigating the robbery.

Based on Larry Johnson's identification of Defendant, Detective Clayton obtained a search warrant for Defendant's residence. Upon execution of the warrant, detectives retrieved two handguns: a revolver and a semi-automatic pistol from the home. Defendant was placed in custody. Defendant waived his Miranda rights, and told police that he was indeed at the mall on the date of the incident, and that he was later on the bus with Lynnette Paul. Later, detectives recovered Archie Poteat's neck chain from Defendant's brother, Teshaun, and recovered Larry Johnson's neck chain from Marcus Jackson who testified at trial that he got the chain from Defendant two or three days after the robbery.

On appeal from convictions of two counts of robbery with a dangerous weapon and one count of simple assault, Defendant contends the trial court erred by, among other things, admitting evidence of guns found in Defendant's home that were not tied to the robbery. The majority reverses Defendant's conviction on the grounds that the evidence of the guns seized from Defendant's residence was irrelevant to the charge of armed robbery. I agree that the evidence regarding the revolver was irrelevant; consequently, I concur with the majority that Defendant is entitled to a new trial.

Defendant relies on *State v. Patterson*, 59 N.C. App. 650, 297 S.E.2d 628 (1982), to argue that the trial court's admission of evidence regarding guns not tied to the robbery was error. The victim in *Patterson* was robbed of her wallet and car keys by a man with a gun. *Id.* at 651, 297 S.E.2d at 629. "During cross-examination of the defendant the assistant district attorney brought out testimony to the effect that there was a sawed-off shotgun in the car in addition to the pistol identified by the robbery victim." *Id.* at 652, 297 S.E.2d at 630.

Upon review, this Court held in *Patterson* that "[t]he shotgun was not connected to the robbery and it was clearly not relevant to any issues in the case. Therefore, the shotgun was erroneously admitted

into evidence." *Id.* at 653, 297 S.E.2d at 630. No error was found (or alleged) in the fact that "[a] small caliber pistol which the State contend[ed] was the weapon used in the commission of the robbery was introduced and the victim identified this pistol as being very similar to the one used in the robbery." *Id.* We held further "that there [was] a reasonable possibility that the erroneous admission of the shotgun evidence contributed to the defendant's conviction, particularly in light of the conflicting evidence regarding the identity of the defendant as the man who robbed [the victim]." *Id.* at 653-54, 297 S.E.2d at 630.

In the present case, the witnesses described the weapon used during the robbery and assault as a large gray semi-automatic pistol. Detective Clayton identified the guns seized from Defendant's home as being (1) a silver semi-automatic pistol, and (2) a small gray revolver. The State introduced both guns seized from Defendant's home into evidence over Defendant's objection. A photograph of the revolver was introduced without objection and published to the jury. I agree with the majority that admitting the revolver was prejudicial error; however, I disagree that admitting the semi-automatic pistol was error.

Regarding the semi-automatic pistol, the victims in this case were robbed by a man with a gray semi-automatic pistol. A silver semi-automatic pistol was seized from Defendant's home. I believe this makes evidence of the semi-automatic relevant to the State's case against Defendant, whether or not the semi-automatic seized was the same gun used in the robbery. *See State v. See*, 301 N.C. 388, 391, 271 S.E.2d 282, 284 (1980) (holding no error in State's exhibiting to the jury a pistol similar to that used during an armed robbery); *State v. Bush*, 78 N.C. App. 686, 689, 338 S.E.2d 590, 592 (1986) (holding that a hatchet was relevant in defendant's trial for armed robbery and assault when defendant "had access to the particular hatchet, and it was at least the same as or similar to the one used in perpetrating the crimes."). Insofar as the majority holds evidence of the semi-automatic was not relevant, I respectfully disagree.

However, regarding the revolver, this case involved conflicting evidence regarding the identity of the man who robbed Larry Johnson and Archie Poteat. The risk of prejudice to Defendant by the admission of improper evidence was correspondingly high. Both victims testified that their assailant wielded a semi-automatic pistol. Notwithstanding, the trial court admitted evidence of a gun seized from De-

fendant's residence—the revolver—that was obviously not involved in the commission of the robbery. *Patterson* addressed these precise circumstances. Applying *Patterson* strictly, I concur in the result that awards Defendant a new trial.

