IN THE SUPREME COURT OF NORTH CAROLINA

No. 343PA14

(Filed 21 August 2015)

STATE OF NORTH CAROLINA

v.

JAMES DOUGLAS TRIPLETT


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision

of the Court of Appeals, ___ N.C. App. ___, 762 S.E.2d 632 (2014), vacating a judgment

entered on 18 February 2013 by Judge Edgar B. Gregory in Superior Court, Wilkes

County, and ordering that defendant receive a new trial.  Heard in the Supreme Court

on 20 April 2015.

> *Roy Cooper, Attorney General, by Teresa M. Postell, Assistant Attorney General,*
> *for the State-appellant.*
>
> *Staples S. Hughes, Appellate Defender, by David W. Andrews, Assistant*
> *Appellate Defender, for defendant-appellee.*


HUDSON, Justice.

Here we are asked to determine if the trial court abused its discretion by

excluding evidence of a threatening voice mail message left by one of defendant's

sisters for a different sister.  We hold that it did not.

The evidence at trial tended to show the following:  On 9 December 2009,

defendant was drinking and using drugs with his brother and two other co-

defendants. That evening, the men went to the victim's house looking for more drugs. While they were there, a fight broke out and defendant fatally stabbed the victim. One co-defendant testified that the plan was to rob the victim of his drugs, and a cellmate of defendant's testified that defendant told him he killed the victim in the course of a robbery. At trial defendant maintained that he was unaware of any plot to steal drugs from the victim, blacked out during the ride to the victim's house, and only stabbed the victim because when he came to, he heard one of his companions yell, "He's got a gun," and saw the men fighting. Defendant claimed self-defense.

The State called defendant's sister Teresa Ogle as a witness at trial. Around the time of these events, defendant lived with Ogle in her mobile home on family land owned by a different sister. Ogle testified that on the night in question, defendant and the co-defendants arrived at home in bloody clothing and that defendant's brother, one of the co-defendants, had been stabbed in the leg. While defendant first claimed the blood and injuries were the result of a hunting accident, he soon admitted what had happened, stating that he had killed a man and that he was no better than his grandfather, who had killed his grandmother. Ogle further testified that when she left for work later that evening, defendant gave her interlocking potholders apparently containing something and that she threw the potholders over a bridge on her way to work. Most significantly, Ogle testified that defendant told her he knew that the co-defendants had planned to rob the victim and that he took a knife from

her kitchen to the victim's residence that night because he knew the victim had a gun. A large knife was missing from Ogle's kitchen.

In her testimony, Ogle also alluded to a potential rift within the family over her testimony for the State. She testified that defendant called her and urged her not to testify, and that he hung up on her when she told him she would tell the truth. On cross-examination, the defense sought to attack Ogle's credibility by questioning her about her previously diagnosed bipolar disorder and by attempting to show animus between Ogle and defendant and their family. Out of the presence of the jury, defense counsel asked to introduce a voice mail message Ogle left for another sister in the family. The defense played the message for the trial court and explained that it was left by Ogle in late 2011 after the family had evicted her from the family land and had allegedly threatened Ogle to keep her from testifying. The message included hostile statements towards the sister in response to an eviction notice taped on Ogle's door and a statement that Ogle "can call the law" or "call the D.A." Defense counsel argued that the voice mail suggested that Ogle was biased against defendant and their family. In response, the State asserted that the message was unrelated to the current charges (and much more relevant to an eviction proceeding and a charge of interfering with and intimidating a State's witness pending against the sister for whom the voice mail had been left). After some discussion, the trial court excluded the evidence under Rule 403, concluding that the probative value of the message was

substantially outweighed by confusion of the issues and that defendant would be potentially prejudiced by admission of the evidence.

The jury convicted defendant of robbery with a dangerous weapon, second-degree burglary, and first-degree murder under the felony murder rule. The trial court arrested judgment on defendant's convictions for robbery with a dangerous weapon and second-degree burglary, and entered judgment on the first-degree murder conviction. Defendant was sentenced to life imprisonment without parole. Defendant appealed.

The Court of Appeals held that the trial court erred in excluding the voice mail message. *State v. Triplett*, ___ N.C. App. ___, ___, 762 S.E.2d 632, 636 (2014). After discussing the abuse of discretion standard of review, that court held that the voice mail message was "relevant to attack Ogle's credibility and show Ogle's bias towards defendant and defendant's family." *Id.* at ___, 762 S.E.2d at 636. Noting that the trial court had "serious doubts" regarding the relevance of the evidence, the Court of Appeals concluded that "because the trial court questioned the relevance of the message, the trial court could not have properly weighed the probative value of the message against the dangers of unfair prejudice and confusion." *Id.* at ___, 762 S.E.2d at 636. Finally, the Court of Appeals held that the error was prejudicial because "Ogle was a key witness for the State" and gave essential testimony regarding defendant's knowledge of the plan to rob the victim before the group left for the

victim's house. *Id.* at ___, 762 S.E.2d at 636. The Court of Appeals reasoned that "[w]ithout evidence that defendant was aware of the plan to rob [the] victim, it is likely the jury would not have found defendant guilty of robbery and burglary, the felonies underlying defendant's conviction for first degree felony murder." *Id.* at ___, 762 S.E.2d at 636. Accordingly, the Court of Appeals vacated the judgment and ordered that defendant receive a new trial. *Id.* at ___, 762 S.E.2d at 637.

We review relevancy determinations by the trial court de novo before applying an abuse of discretion standard to any subsequent balancing done by the trial court. *See State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012) (explaining that before a reviewing court applies an abuse of discretion standard in evaluating a Rule 404(b) ruling by the trial court, it must "review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)"). We have also said that "[a] trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal." *State v. Lane*, 365 N.C. 7, 27, 707 S.E.2d 210, 223 (citations omitted), *cert. denied*, ___ U.S. ___, 132 S. Ct. 816, 181 L. Ed. 2d 529 (2011). In ruling on relevancy, the trial court stated: "So I make the following ruling. I rule that this tape may not be played before the jury; that I really have problems with Rule 402 and whether it's relevant." The trial court then conducted a Rule 403 balancing test. Here, as noted by the Court of Appeals, the voice mail does show potential bias by Ogle against defendant and his family. Therefore, like the

Court of Appeals, we hold that the voice mail meets the low bar of relevancy under our standard.

Nonetheless, we reverse the decision of the Court of Appeals for three reasons. First, we hold that the trial court properly determined that, while barely so, the evidence was relevant, and then weighed its probative value against Rule 403 concerns. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2013). "Evidence which is not relevant is not admissible." *Id.* Rule 402 (2013). Although the trial court's remarks are subject to different interpretations, the court did not clearly state that the voice mail was irrelevant. Instead, it appears the trial court believed the voice mail had minimal relevance, the admissibility of which the trial court then evaluated in an extensive Rule 403 balancing analysis. More importantly, because the trial court conducted the Rule 403 analysis, it necessarily found the voice mail relevant; otherwise, the court would have excluded the evidence under Rule 402, making a Rule 403 analysis unnecessary or at least, mere surplusage.

Second, despite defendant's arguments to the contrary and the statements of the Court of Appeals, Ogle was not a key witness for the State. Defendant argues (and the Court of Appeals agreed) that Ogle was the only witness to testify to

defendant's prior knowledge of the robbery plan. This assertion is not accurate; while

Ogle did testify to that fact, other witnesses did so as well. One of the co-defendants,

Dillon Walsh, testified as follows regarding the plan:

> [The State.] And what did Ben [Watson, a third co-defendant] say after he had talked about the amount of crack that Bruce [the victim] had?
>
> [Mr. Walsh.] He was wanting to go get it.
>
> Q. Okay. Did he talk about you-all coming with him?
>
> A. Yeah.
>
> Q. And what was the purpose of you coming with him?
>
> A. I guess to try to take his dope.
>
> Q. Why do you say that?
>
> A. Because Ben said, "You-all hold him. I'll take his dope."
>
> Q. How did you guys get from the living room to whatever car you got into?
>
> A. We walked.
>
> Q. Was everybody in the living room when Ben said that?
>
> A. I think so.

In addition, defendant's cellmate testified that defendant knew about the plan to rob

the victim:

> [The State.] Okay. . . . What did the defendant tell you was their purpose for going up to Bruce Barnes' house

that night?

[Mr. Dickerson.] To get crack.

Q. And did he describe how they were going to get that crack?

A. One way or another.

Defense counsel effectively attempted to discredit this evidence by arguing that both of these witnesses gained concessions from the State for their testimony and pointing to inconsistencies in Mr. Walsh's previous statements. Nonetheless, it is not this Court's function to evaluate the credibility of a witness; the jury here apparently believed these witnesses, as it was free to do. In addition to the above testimony describing defendant's knowledge of the robbery plan, Ogle's testimony on this point was not crystal clear. At first she testified only that defendant went armed to the victim's house because defendant knew the victim had a gun and knew they were going to get drugs:

> [Ms. Ogle.] He said he took [the knife] before they left. And I said, "Why would you take a knife from my kitchen that I used with you to buy drugs?"
>
> [The State.] Did he respond to that statement -- or your question?
>
> A. "Well, Bruce has got a gun. We know he has got a gun."
>
> Q. Did James ever tell you why he went up to Bruce's house that night?
>
> A. Said they went to get crack.

This testimony does not necessarily contradict the theory that defendant and the others went to the victim's house to buy drugs (a version of events presented earlier at trial by co-defendant Ben Watson). Later, Ogle's testimony changed slightly:

> Q. [In] [w]hich conversation did the defendant tell you why they went up to Bruce Barnes' house that night?
>
> A. It was probably the next day, the 10th. We were riding, just like we did always, out on the back dirt roads. And he said that they had went over there to buy crack. He said that he knew that Ben had planned to rob him.

Ogle then clarified her statement, appearing to explain that she meant that defendant knew Ben Watson planned to rob the victim earlier the same day:

> Q. And I believe you just had testified that James knew that Ben planned to rob him; is that what you testified?
>
> A. Right, but he wasn't with him when he robbed him because he didn't go the first time.

Given the confusion and inconsistencies in her testimony and the existence of other witnesses' testimony regarding defendant's knowledge of the plan to rob the victim on the night of 9 December 2009, Ogle's testimony becomes less significant. Taken together, these three witnesses potentially strengthened the State's case against defendant; however, the State could prove even without Ogle's testimony that defendant knew about the plan to rob the victim. As such, any alleged bias resulting from a fight between Ogle and her family becomes less probative.

Third, we hold that the trial court did not abuse its discretion in excluding the evidence under a Rule 403 balancing test. Under Rule 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (2013).

> We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion. An abuse of discretion results when "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record."

*State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008) (citing and quoting *State v. Peterson*, 361 N.C. 587, 602-03, 652 S.E.2d 216, 227 (2007), *cert. denied*, 552 U.S. 1271, 128 S. Ct. 1682, 170 L. E. 2d 377 (2008)). In weighing the probative value against any potential Rule 403 concerns, the trial court stated:

> I rule under 403 that the probative value is substantially outweighed by the confusion of the issues involving her eviction and the problems that she might have had with her sisters; that there is no -- it's not fair to tie whatever problem she had with her sisters to the defendant; that may be prejudicial to the defendant.

Defense counsel then tried to have only a portion of the tape admitted, but the trial court rejected the argument again, reiterating:

> All right. I decline that request for the same reasons, that I think it would open up an area that would be confusing

> to the jury; that you may ask her about any problems, if you desire, about her feelings about her family. But anything about an eviction, it seems to me that that are things that don't relate to the defendant necessarily . . . .
>
> . . . .
>
> It opens up areas that are not necessary and are confusing. And under Rule 403 and the balancing test, I'm going to keep it out as the gatekeeper of the evidence.

Such a ruling was not an abuse of discretion. The trial court here looked at the weak probative value of the evidence and weighed it against the confusion that could result from drawing the jury into a family feud that was tangential to the death of the victim here. We hold that it was not "manifestly unsupported by reason," *id.* at 160, 655 S.E. 2d at 390, for the trial court to rule that the probative value of the voice mail message was outweighed by the other concerns under Rule 403.

Having found no abuse of discretion, we need not examine any potential prejudice to defendant. Accordingly, for the reasons stated above, the opinion of the Court of Appeals is reversed. We remand this case to that court for consideration of defendant's remaining issue on appeal and if necessary, for additional proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.