IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-699

No. COA21-218

Filed 21 December 2021

Buncombe County, No. 17 CRS 529

STATE OF NORTH CAROLINA

v.

BRENDA KAY MCCUTCHEON

Appeal by defendant from judgment entered 14 February 2020 by Judge Peter Knight in Buncombe County Superior Court. Heard in the Court of Appeals 1 December 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Robert C. Ennis, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Emily Holmes Davis, for defendant-appellant.*

TYSON, Judge.

Brenda Kay McCutcheon ("Defendant") appeals a jury's verdict finding her guilty of first-degree murder. Defendant was sentenced to life imprisonment without possibility of parole. We find no error.

## I. Background

Defendant and Dr. Frank "Buddy" McCutcheon, Jr. ("Buddy"), a surgeon aged 64, had been married for 32 years in July 2016. On 15 July 2016, Buddy fell asleep

on the living room sofa around 9:30 p.m. Defendant testified she fell asleep in the upstairs bedroom around 11:00 p.m. Around 3:30 a.m. on 16 July 2016, she purportedly heard a loud noise and went downstairs to investigate. She entered the living room, smelled gunpowder, and determined Buddy had been shot. Defendant testified she ran out the front door, ran through the ivy to the neighbors' house and banged on their door. When no one answered the door, Defendant stated she ran back to her house, grabbed the mobile phone, ran back outside, and called 911.

¶ 3        Emergency responders found Buddy had been shot one time in the back of his head as he slept. Officers found a silver gun in the shrubs beside the McCutcheons' home. The gun belonged to Buddy and had fired the bullet later recovered from Buddy's head.

¶ 4        Defendant's fingerprints were not found on the gun. A DNA mixture was found on the gun, but the major contributor was Buddy. No determination could be made about the two minor contributors. No blood was found on Defendant's clothing. No gunshot residue was found on Defendant's hands, pants, or underwear, but her shirt contained one small particle, characteristic of gunshot residue, but with the origin inconclusive.

¶ 5        Roxanne Whittington, a family friend, went to the McCutcheons' home to offer her condolences about a week later. Whittington was interviewed by police. Whittington testified Defendant's demeanor toward her was "very cold." On 11

August, Whittington reached out to police to provide additional information about Buddy's death and officers conducted a second interview. Whittington testified on direct examination that during the first interview, she was grieving, in shock, and it was a combination of "[Defendant's] actions or lack of remorse" and "getting [her] head a little clearer" that caused her to request a second law enforcement interview.

¶ 6        Sabrina Adams testified at trial she had worked with the McCutcheons at the medical practice for 11 years. During that time, she was engaged in a four-year sexual affair with Buddy, but she asserted Defendant did not know about it until after Buddy was killed. Adams suggested during her testimony that Defendant had killed Buddy because Defendant had mismanaged the practice's finances.

¶ 7        A North Carolina Department of Revenue ("DOR") investigation showed that from May 2012 to June 2016, the practice failed to pay withholding taxes from employee paychecks to the DOR. Defendant was Buddy's office manager, was responsible for submitting withholding taxes to DOR, and had failed to do so. The State theorized Defendant had killed Buddy to keep him from learning about the withholding tax deficit.

¶ 8        Buddy's brother, Richard McCutcheon, testified at trial. Richard was asked questions regarding his relationship with his oldest brother, Buddy. Richard was then asked, "How has [Buddy's] death affected you and your family?" Richard testified it was a "dark place," it was "terrible" and "tragic." Richard's wife, Rebekah,

also testified. The prosecutor asked her how Buddy's death had affected Richard. Rebekah recounted Richard had locked himself in his room for weeks after the murder.

The jury heard testimony from detectives, neighbors, family, friends, co-workers, and associates. The jury asked to review several exhibits and deliberated 6.5 hours over the course of two days to reach a verdict. On 14 February 2021, the jury found Defendant to be guilty of first-degree murder. Defendant was sentenced to life imprisonment without the possibility of parole and timely filed this appeal.

## II. Jurisdiction

This appeal is properly before this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b) (2019).

## III. Issue

Whether the trial court committed plain error by admitting testimony from Buddy's brother concerning how Buddy's death had affected him.

## IV. Argument

### A. Plain Error Review

To preserve an issue for review, a party must have presented a timely motion or objection below, stating the specific grounds for the ruling desired, and have obtained a ruling. N.C. R. App. P. 10(a)(1). "The scope of review on appeal is limited to issues so presented in the several briefs. Issues not presented and discussed in a

party's brief are deemed abandoned." N.C. R. App. P. 28(a). Where a defendant does not challenge the admission of evidence on appeal, this Court is "necessarily required to assume that [the evidence] w[as] properly admitted[.]" *State v. Mumma*, 372 N.C. 226, 234, 827 S.E.2d 288, 294 (2019).

¶ 13 An unpreserved issue may be presented on appeal "when the judicial action questioned is *specifically and distinctly* contended to amount to plain error." N.C. R. App. P. 10(a)(4) (emphasis supplied).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said "the . . . mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Cummings*, 352 N.C. 600, 616, 536 S.E.2d 36, 49 (2000) (citations and internal quotation marks omitted).

¶ 14 An "empty assertion of plain error, without supporting argument or analysis of prejudicial impact," is insufficient to warrant a review of the merits. *Id*. at 637, 536 S.E.2d at 61.

¶ 15 Also, "a defendant who invites error has waived his right to all appellate review

concerning the invited error, including plain error review." *State v. Crane*, 269 N.C. App. 341, 343, 837 S.E.2d 607, 608 (2020) (citation omitted). Eliciting the same or similar contested evidence on cross-examination waives the right to challenge the admission of that evidence on appeal. *State v. Wingard*, 317 N.C. 590, 599, 346 S.E.2d 638, 644 (1986).

¶ 16 Here, Defendant failed to object when the challenged testimony was admitted during Richard and Rebekah's direct examinations. Defense counsel elicited evidence of a similar nature about the impact of Buddy's death and Richard's grief upon cross examination. Amplified evidence about Richard's grieving was also admitted without objection during his redirect, which has not been challenged on appeal.

¶ 17 Defendant waived review of Richard's testimony by later eliciting evidence similar in nature during cross. *See id.* Regarding Rebekah's testimony, virtually the same evidence had been admitted previously without objection on Richard's redirect, which Defendant has not challenged and has abandoned. N.C. R. App. P. 28(a). This evidence is now deemed properly admitted. *See Mumma*, 372 N.C. at 234, 827 S.E.2d at 294. Defendant failed to preserve any issue concerning the admission of the challenged statements. *See* N.C. R. App. P. 10(a).

¶ 18 Defendant has failed to show plain error review is warranted when the separate, unchallenged admissions are essentially the same as the challenged evidence derived from Richard's and Rebekah's direct examinations. Defendant

instead treats all of the evidence cumulatively in arguing plain error. *See State v. Lane*, 271 N.C. App. 307, 316, 844 S.E.2d 32, 40 (2020) (recognizing plain error review requires prejudice to be shown). Defendant failed to show that hers is an "exceptional case" warranting review or to demonstrate any prejudice therefrom. *Cummings*, 352 N.C. at 616, 536 S.E.2d at 49. Defendant failed to show this Court should review the merits of her asserted arguments.

## B. Admitting Evidence

¶ 19 Defendant asserts the trial court erred by admitting into evidence certain statements by Richard and Rebekah McCutcheon during their direct examinations. Defendant argues the statements were irrelevant under Rule 401 and are inadmissible under Rule 402.

¶ 20 "A trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal." *State v. Lane*, 365 N.C. 7, 27, 707 S.E.2d 210, 223 (2011) (citations omitted). Relevant evidence includes all "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2019). Generally, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2019). "[E]vidence need not bear directly on the question in issue if it is helpful to understand the conduct of the parties, their motives, or if it

reasonably allows the jury to draw an inference as to a disputed fact." *State v. Roper*, 328 N.C. 337, 356, 402 S.E.2d 600, 611 (1991) (citation omitted).

¶ 21     "The jury's role is to . . . assess witness credibility[.]" *State v. Moore*, 366 N.C. 100, 108, 726 S.E.2d 168, 174 (2012).   Hence, evidence impacting the jury's assessment of witnesses' credibility generally is always relevant under Rule 401. *See State v. Triplett*, 368 N.C. 172, 175, 775 S.E.2d 805, 807 (2015).   Evidence "offered to explain the conduct of a witness [is] relevant and admissible[.]" *Roper*, 328 N.C. at 356, 402 S.E.2d at 611.   Evidence may be "relevant to explain or rebut the evidence elicited by defendant through cross-examination of the State's witnesses." *State v. Cagle*, 346 N.C. 497, 507, 488 S.E.2d 535, 542 (1997).

### *1.  Richard's Testimony*

¶ 22     Defendant challenges Richard's statements describing the impact of his brother's death during his direct examination, stating it was a "dark place," "terrible," "tragic," and John, his younger brother "still cries to this day."

¶ 23     Prior to Richard's testimony, Defendant had attempted to impeach Roxanne Whittington's credibility by suggesting potential bias and coordination among several of the State's witnesses, including Richard.   Defendant elicited evidence suggesting that Whittington had spoken with Richard and others shortly after Buddy's murder, that Whittington learned from them about the criminal investigation into the medical practice's tax embezzlement.   Roxanne's conversation with Richard had allegedly

caused her to reach out to police and to conduct a second interview in August 2016, wherein she stated that she believed Defendant had murdered Buddy.

Later, during Richard's direct examination, the prosecutor revisited the issue, eliciting testimony from Richard that "it was about six or seven months after [Buddy's] death that [he] had finally talked to [Whittington]."

The prosecutor then asked, "How has [Buddy's] death affected you and your family?" Richard replied:

> It's been terrible. I can't -- I lost my only son two years before Buddy. And I can tell you, if anybody has children, there is nothing worse, I don't think, in this life. But a year later I lose my 18 year old grandson at my daughter's birthday party as well. . . . Then a year later Buddy's gone. It's a dark place. It's tragic. And I don't think words can explain it, but my little brother still cries, still cries to this day.

Defendant did not object nor move to strike any of Richard's answers.

Defendant attempted to impeach Richard's credibility during cross examination by referencing prior inconsistent statements he made to police in July 2016.

> [Defense counsel]: Okay. And he is a no-nonsense police officer. You can tell that by looking at him, correct?
>
> [Richard]: Yes, sir.
>
> [Defense counsel]: All right. So he doesn't have any reason to write down what you are calling to tell him, to write it down wrong?

[Richard]: Okay.

[Defense counsel]: Is that right?

[Richard]: Probably. [Indecipherable.] I am sure he did what he thoughts (sic) was right.

 . . . .

[Richard]: That's what it says. Yes, sir.

[Defense counsel]: Well is that what you told him?

[Richard]: I believe it was. I was crying. I was grieving. I don't remember any of this.

[Defense counsel]: Okay.

[Richard]: I take your word that it's what I said, but I can tell you right now when you lose your brother like this –

 . . . .

[Richard]: -- you are crying. You are in such pain. I can not remember any of this.

¶ 27 Defendant elicited testimony from Richard: "when you lose your brother like this . . . you are in such pain" and he could "not remember any" of the police interview.

¶ 28 The extent of Richard's grief after Buddy's death was relevant to explain or rebut the evidence Defendant had elicited during Whittington's cross-examination. That evidence suggested Richard had spoken with Whittington shortly after Buddy's death, supplied her with incriminating information that she had told the police, and had influenced Whittington's decision to conduct the second police interview in August 2016 wherein she stated she believed Defendant had murdered Buddy. *See*

*Cagle*, 346 N.C. at 507, 488 S.E.2d at 542. The evidence was also admissible to provide the context for Richard's answer and for the jury to understand why it was unlikely Richard had spoken with Whittington until months after her August 2016 interview with officers. *Roper*, 328 N.C. at 356, 402 S.E.2d at 611. The testimony was further relevant to the jury's assessment of Richard's credibility as a State witness by providing a better understanding of any possible motives or biases. In view of the "great deference" afforded a trial court, the challenged testimony satisfied the low bar of logical relevance to allow admission. *See Lane*, 365 N.C. at 27, 707 S.E.2d at 223.

¶ 29        Even if the challenged statements were admitted in error, Defendant waived review and invited error by eliciting evidence of a similar nature during Richard's cross-examination. *See Crane*, 269 N.C. App. at 343, 837 S.E.2d at 608.

### 2. *Rebekah's Testimony*

¶ 30        Defendant challenges Rebekah's testimony that "Richard locked himself in his room for six weeks" when Richard believed it was only two weeks.

¶ 31        "Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness." *State v. Garcell*, 363 N.C. 10, 39, 678 S.E.2d 618, 637 (2009) (citations and internal quotation marks omitted).

¶ 32        The prosecutor asked Richard about his behavior following his brother's death during his redirect examination. Richard explained he did not interact with family much, spending most of his time in his bedroom grieving. Defendant has not

challenged the admission of this evidence.

Rebekah testified after her husband, Richard. During Rebekah's direct examination, the prosecutor revisited the issue and asked what Rebekah had observed about Richard's behavior following Buddy's death. Rebekah testified that Richard had locked himself in his room for weeks, he was "heart broken," she did not "think [Richard] knew how to deal with . . . the grief," and that it was "horrible."

It is relevant that Richard's grief from his brother's death rendered him unwilling to communicate even with his family for weeks. That evidence of Richard's grief is relevant to rebut the evidence Defendant elicited concerning the timeline of Richard's communication with Whittington, and whether Richard influenced her to conduct the August 2016 police interview.

Testimony of Richard's grief by Rebekah is also relevant as corroborative evidence admitted previously during Richard's redirect examination. Defendant attempted to impeach Richard's credibility further on cross-examination with prior inconsistent statements. Rebekah's testimony was more relevant for the jury's assessment of Richard's credibility. *See State v. Chapman*, 359 N.C. 328, 358, 611 S.E.2d 794, 818 (2005). Defendant's argument has no merit.

### 3. *Victim-Impact Evidence*

Victim-impact evidence includes the "nature and extent of any physical, psychological, or emotional injury suffered by the victim" or their family "as a result

of the offense committed by the defendant." N.C. Gen. Stat. § 15A-833(a)(1) (2019).

¶ 37      In *Graham*, the prosecutor asked a victim's mother—who was present when the defendant and an accomplice broke into her home at night and then witnessed the defendant stab her son multiple times—numerous questions during a lengthy colloquy during the guilt phase. *State v. Graham*, 186 N.C. App. 182, 187-89, 650 S.E.2d 639, 644-45 (2007).

¶ 38      This Court held the questions asked and the answers elicited, combined with the State's reference to the witness as a "second victim," constituted inadmissible victim-impact evidence irrelevant to the context or circumstances of the crime. *Id.* at 192, 650 S.E.2d at 646. In light of the entire record and evidence of the defendant's guilt, this Court applied the prejudicial standard under Section 15A-1443(a) and held there was no "reasonable possibility that the jury's verdict would have been different." *Id.* at 192, 650 S.E.2d at 647.

¶ 39      Here, Buddy's brothers were not present for his murder. The State did not ask the kinds of questions of them, similar to those asked in *Graham*. The challenged evidence was not only relevant for victim-impact purposes. Defense counsel elicited evidence that Buddy's brother, John, did not "want [Defendant] held responsible if she wasn't the one who did it." Defendant elicited testimony that John had tried to "keep some sort of contact with [Defendant] more than other people have" and "extended the benefit of the doubt to [Defendant] more than other people in the

family[.]"   Defendant failed to preserve these issues for appeal and they are dismissed.

### C. Defendant's Burden to Show Prejudice

¶ 40       To establish prejudice, Defendant must show "after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.'" *State v. Grice*, 367 N.C. 753, 764, 767 S.E.2d 312, 320–21 (2015) (citation omitted).   "Defendant can show no prejudice where evidence of a similar import has also been admitted without objection and has not been . . . [challenged] on appeal." *State v. Trull*, 349 N.C. 428, 456, 509 S.E.2d 178, 197 (1998) (citation omitted).

¶ 41       Here, the uncontradicted evidence established each element of first-degree murder:  Buddy was fatally shot in the back of his head with his gun by someone inside of his home while he was asleep.  The critical issue before the jury was whether Defendant or someone else perpetrated the murder.  Defendant acknowledged after the State rested "the elements of the crime are satisfied" and disputed only the fact of whether she was the perpetrator.

¶ 42       The jury heard testimony and evidence to support the facts that: (1) Defendant was in the home when Buddy was murdered; (2) Buddy had not been awoken by an intruder or their dog barking; (3) there were no signs of forcible entry and nothing appeared displaced; (4) the murder weapon was usually stored in the kitchen drawer among other miscellaneous items; and, (5) the weapon was later found discarded

outside right next to the home.

¶ 43    Overwhelming circumstantial evidence links Defendant to Buddy's murder, that is wholly unrelated to evidence about Richard's or John's grief dealing with the unexpected death of their brother.   No reasonable probability is shown, had the challenged statements been excluded, the jury would have acquitted Defendant of first-degree murder, had the challenged statements been excluded.

## V. Conclusion

¶ 44    "[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case." *Cummings*, 352 N.C. at 616, 536 S.E.2d at 49.

¶ 45    Defendant waived review by failing to object and by eliciting like testimony of with she complains.  The testimony of Richard and Rebekah is relevant to support the witnesses' credibility.  Defendant has failed to show prejudice.  Defendant received a fair trial, free from prejudicial errors she preserved or argued.  We find no error in the jury's verdict or in the judgment entered thereon.  *It is so ordered.*

NO ERROR.

Judge GRIFFIN concurs.

Judge ARROWOOD concurs in result only.