An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-846

Filed 6 May 2026

Mecklenburg County, Nos. 19CR023731-590, 19CR023732-590, 19CR023733-590, 19CR023734-590, 19CR023735-590, 19CR220222-590, 19CR220223-590, 19CR220225-590, 19CR220226-590

STATE OF NORTH CAROLINA

v.

IBN ALSHAKOR REID, Defendant.

Appeal by defendant from judgment entered 7 October 2024 by Judge Clifton H. Smith in Mecklenburg County Superior Court. Heard in the Court of Appeals 21 April 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Kristin W. Peebles, for the State.*
>
> *Center for Death Penalty Litigation, by Kailey Morgan, for defendant-appellant.*

FLOOD, Judge.

Defendant Ibn Alshakor Reid appeals his convictions for assault with a deadly weapon with intent to kill, four counts of discharging a weapon into an occupied vehicle, and fifteen counts of attempted discharge of a firearm into an occupied vehicle. On appeal, Defendant argues the trial court, first, abused its discretion by

allowing the State to present inadmissible evidence of two stolen firearms that were not related to the charged crimes; second, abused its discretion by admitting gang-related evidence; and third, erred in ordering restitution when the amount was not supported by competent evidence. After careful review, we hold the trial court did not err by admitting evidence relating to the two stolen firearms and the gang-related evidence. Where the evidence was too vague to support the awarded restitution amount, however, we vacate the restitution award and remand to the trial court for a new hearing to determine the appropriate amount of restitution.

## I. **Factual and Procedural Background**

On the morning of 29 May 2019, at approximately 10:37 a.m., Noah Jackson[1] and a man wearing red shoes and a red, long-sleeved shirt with a Kappa logo walked into a Circle K located in Charlotte, North Carolina. As the two men walked around the store, a gold sedan pulled out of a parking area next to the Circle K and parked at one of the fuel pumps. A few minutes later, the man in the red shirt walked out of the Circle K and got into the gold sedan. When Jackson walked out of the door, he ran into an unknown man wearing a black pullover, and the two started scuffling. A man wearing a black, short-sleeved t-shirt ran out of the Circle K and pulled out a gun. Jackson ran to the gold sedan and got in, and the gold sedan sped away. After retrieving a few things from the ground, the men wearing black ran away on foot.

---

[1] Noah Jackson is Defendant's co-defendant.

Around 10:54 a.m., Jackson and a man who was wearing red shoes and had a red shirt draped around his head and neck walked to the side of the Circle K where the gold sedan had been parked at earlier that day. The man with the red shirt draped around his neck started shooting towards the gas pumps before he and Jackson ran off.

At the time of the shooting, Hakeem White was attempting to put his young daughter into her car seat. Concerned for the safety of his daughter and his then-girlfriend, Saundra Leroy, who was in the front passenger seat, White quickly got in his car and fled the scene. Due to three flat tires and other damage caused by the bullets, White had to pull over at a nearby fire station. Saundra and White's daughter were unharmed; however, White had to be transported to a hospital to be treated for non-fatal injuries to his head.

Two minutes after the shooting, Charlotte-Mecklenburg police officers responded to the scene. Police officers found twenty discharged .40 caliber shell casings in the area where Jackson and the man with the red shirt draped across his neck had been. Police Officer Shane Matthews attempted to identify the men by reviewing the Circle K surveillance videos and talking with Circle K employees; however, no one could positively identify the shooter. Later that day, Officer Matthews sent a "BOLO"—otherwise known as a "be on the lookout"—email to the officers of the Charlotte-Mecklenburg Police Department with photos of the unidentified suspects.

The next day, on 30 May 2019, Lieutenant Mark Hefner was driving near the Parkland Circle Apartments when he saw someone he believed to be one of the suspects from the BOLO. Lieutenant Hefner tried talking to the man, but the man—later identified as Jackson—kept walking. After seeing which apartment Jackson walked into, Lieutenant Hefner radioed for backup so that they could conduct "a knock and talk[.]" Once the backup arrived, shortly after 11:00 p.m., Lieutenant Hefner started knocking on the door, trying to get someone to come to the door. No one came to the door for "a while[,]" but Lieutenant Hefner "engaged in conversation with the subject inside the apartment" and "eventually convinced him to come outside." When Jackson came outside, Defendant and Defendant's girlfriend, Davion Carr, also came outside. Immediately after exiting the apartment, the police officers detained Jackson, Defendant, and Carr. Following a protective sweep of the apartment, the police officers arrested Defendant pursuant to outstanding warrants.

At approximately 3:00 a.m. on 31 May 2019, police officers obtained a search warrant for the apartment. During the search, officers found a red, long-sleeved shirt with a Kappa logo on it and a pair of red shoes. Jackson was then placed under arrest. Although unrelated to the Circle K shooting, Carr was also placed under arrest. When Carr's case was dismissed, evidence related to her case, including the red, long-sleeved shirt, was destroyed. There was no evidence presented that any DNA or other forensic testing had occurred before the destruction of the clothing.

Subsequently, Defendant was indicted for (1) five counts of discharging a

firearm into an occupied vehicle; (2) one count of assault with a deadly weapon with intent to killing inflicting serious injury; (3) two counts of assault with a deadly weapon with intent to kill; (4) three counts of attempted first degree murder with a firearms enhancement; (5) one count of conspiracy to commit first degree murder; and (6) fifteen counts of attempted discharge of a firearm into an occupied vehicle.

Prior to trial, the State voluntarily dismissed the firearm enhancement and amended the assault with a deadly weapon with intent to kill inflicting serious injury charge to the lesser offense of assault with deadly weapon intent to kill. Additionally, defense counsel filed a motion in limine to prevent the introduction of evidence related to two stolen firearms that police found on the night Defendant was arrested. The State agreed to not elicit information about the stolen firearms, and the trial court ruled this evidence inadmissible.

Defendant's case came on for trial on 23 September 2024. At trial, the State admitted, *inter alia*, the Circle K surveillance videos; a copy of the BOLO which had pictures of the Circle K shooting suspects; body camera footage from the "knock and-talk"; and pictures of the red, long-sleeved shirt that police officers found during the search of Defendant's apartment. The State also sought to introduce five phone calls made by Defendant while in jail. Defense counsel objected to the State publishing the first phone call because there were multiple references to "rolling 6-0's, affiliated, and flag." Defense counsel argued these terms should be excluded because they "refer to some type of gang affiliation[,]" and "[t]here's been no allegation of [a] gang being a

motive in this case[.]" After listening to the phone calls outside of the jury's presence, however, the trial court overruled Defendant's objection. When the State published the jail phone calls at trial, defense counsel objected by stating: "Previous objection to certain aspects maintaining all constitutional [and] statutory bas[e]s. The Court has ruled."

Testifying for the State, Officer Matthews described the initial police investigation, and Lieutenant Hefner and Detective Elliott Whitley testified regarding the "knock and talk[.]" While Lieutenant Hefner was on cross examination, defense counsel inquired about his interaction with Jackson on the night of 30 May 2019:

> Q. . . . And when you saw Mr. Jackson, you attempted to get Mr. Jackson's attention, correct?
>
> A. Yes.
>
> Q. And Mr. Jackson continued to walk away, right?
>
> A. Right.
>
> Q. Mr. Jackson was not under arrest at that time, was he?
>
> A. No.
>
> Q. You were attempting to make voluntary contact, right?
>
> A. Right.
>
> Q. And when we use the term voluntary contact, that is when an officer is trying to see will a person voluntarily on their own, what have you, speak with a patrol officer, speak with a law enforcement officer.

A. Right.

Q. As a citizen, if we are not under arrest, we do not have to stop and talk to a police officer if we don't want to, right?

A. Right.

Q. Mr. Jackson at that time was free to walk away as he was doing.

A. Right.

Q. You went to the apartment that Mr. Jackson walked into, correct?

A. Yes.

. . . .

Q. And you were asking Mr. Jackson to come outside, right?

A. Right.

Q. There is a difference between an officer asking if someone will step outside versus an officer knocking on the door and saying, this is the police, open up the door.

A. Right.

Q. Meaning asking to come outside, that's still voluntary.

A. Right.

Q. It went on for a while. It was inconvenient. But at this point, Mr. Jackson or the people inside the home are not breaking the law by not opening the door for you.

A. That's correct.

Q. Now, eventually, though, . . . Mr. Jackson does open the door, right?

A. Yes.

Defense counsel asked Detective Whitley similar questions:

> Q. And the person initially did not come outside of the apartment, right?
>
> A. No.
>
> Q. And at this time, . . . you and Sergeant Hefner and other officers are attempting voluntary contact, right?
>
> A. Yes. Initially, yes.
>
> Q. Meaning when we say voluntary contact, . . . citizens have the right to speak to an officer or if an officer says, hey, can I talk to you, citizens have the right to say, no, I'm going to go about my business.
>
> A. That's true.
>
> Q. All right. At this point, that person has not or had not violated any law by not coming outside the door.
>
> A. Well, from my understanding, he matched the description of the unknown subject from the shooting.
>
> Q. When Sergeant Hefner asked, hey, can I talk to you, can you come outside the door, the person had the right to say no, correct?
>
> A. Yes, unless he had probable cause to detain that person.
>
> Q. And there is a difference between an officer saying, hey, can you come outside versus an officer knocking, this is the police, open up the door.
>
> A. Yeah.

Following Detective Whitley's cross examination, the State argued, outside the presence of the jury, that defense counsel had "opened the door" regarding the two stolen firearms. Specifically, the State argued it was permitted to introduce the

evidence of the two stolen firearms to rebut defense counsel's insinuation that the police officers "either did not have probable cause or did not have a right to have those occupants come out and be seized." In response, defense counsel argued that his questions were related to the Fourth Amendment and did not open the door to allow the State to introduce evidence about the two firearms. After hearing defense counsel's rebuttal, the trial court found "that either the door has been opened by the defendants through cross-examination or the elicited evidence implies improper purpose by the State without the allowing of the additional questions proposed by the State"; the "evidence proposed through the questioning of these topics is necessary for full understanding of the relevant facts in this case and that defense counsel questioned [the] witness regarding law as it relates to search and seizure"; and the "questioning leaves an incomplete picture in the jury's mind or . . . improper performance of law enforcement without allowing the State to question this witness further on these topics would be improper[.]"

Detective Whitley subsequently testified that, when Lieutenant Hefner was knocking on the apartment door, another officer "advised that something had been thrown, made a loud sound, and appeared to be a firearm." After the officers searched through the bushes, Detective Whitley advised Lieutenant Hefner, via radio, that they had recovered two firearms. Although these two firearms "were not .40 caliber[,]" the discovery of the firearms changed how the officers "approach[ed] th[e] knock and talk . . . ."

At the close of all evidence, the trial court dismissed the one count of conspiracy to commit first degree murder.

The jury deliberated for four days. On the first day of jury deliberations, the jury sent a note asking to "revisit the video footage outside at shooting and inside register." On the second day, the jury requested to review "[t]he clearest close-up still image of the faces of . . . the individual identified as Noah Jackson inside the [C]ircle K" and the "individual wearing a red shirt inside the [C]ricle K[.]" On the third day, the jury asked to review specific parts of the surveillance videos again, as well as, "all photographs[.]" After reviewing this evidence, the jury sent a note that stated: "[A]t this time, the jury has found themselves with fundamental differences of opinion that make finding a unanimous verdict unlikely." Defense counsel moved for the trial court to declare a mistrial. Without ruling on Defendant's motion, the trial court called the jury back in and the following conversation took place:

> THE COURT: . . . . Do you believe that further deliberations would enable you to make progress towards a unanimous verdict?
>
> THE FOREPERSON: Without further consulting the remainder of the jury, I am unable to answer that question.
>
> THE COURT: All right. Do you believe that there is a reasonable possibility of agreement in this matter?
>
> THE FOREPERSON: At the moment, I do not believe so.
>
> THE COURT: Do you, without stating what the numeric breakdown is or which way it were to go, how long have you been stuck at your current numeric breakdown as the

charges?

> THE FOREPERSON: Since shortly after deliberation
> began, as best I can tell.

After the jury returned to deliberate, defense counsel renewed his motion for a mistrial "based on [the] foreperson stating that he didn't believe[] . . . that further deliberation would be fruitful, and that they have been at this split since they began deliberations on Wednesday afternoon." The trial court denied Defendant's motion. The trial court then gave an *Allen* charge[2] to the jury.

Approximately one hour after the trial court gave the *Allen* charge, the jury asked the trial court if the jury had "to come to a unanimous decision on all charges, or [if it had] the ability to return a verdict on some charges and not others[.]" After answering this question, the trial court again asked the foreperson if the jury had made any progress towards a unanimous verdict.

> THE FOREPERSON: We have made some progress. I do
> think we are at a roadblock. I'm sorry.
>
> THE COURT: Would further deliberations enable you to
> make progress toward a unanimous verdict?
>
> THE FOREPERSON: I'm going to go with a yes.
>
> THE COURT: Is there a reasonable possibility of an
> agreement?
>
> THE FOREPERSON: I apologize. I'm still struggling on

---

[2] An *Allen* charge "is an instruction that may be given to a deadlocked or 'hung' jury which encourages the jury to continue deliberating and attempt to reach a verdict, while also emphasizing that each individual member should not abandon their honest convictions." *State v. Powell*, 921 S.E.2d 603, 609 n.1 (N.C. Ct. App. 2025) (emphasis omitted).

> that one. I hope for the best. I am struggling to determine a solid answer. I apologize.
>
> THE COURT: But do you believe that further deliberations would enable you to make additional progress toward a unanimous verdict?
>
> THE FOREPERSON: I sincerely hope so. That's my opinion. I don't know that I can speak for the remainder of the jurors.

Before returning to deliberate, the foreperson clarified that the jury had fundamental differences of opinion that make finding a unanimous verdict impossible for "[s]ome charges[,]" but not all.

On the fourth day, after approximately thirteen hours of jury deliberations, defense counsel renewed his motion for a mistrial, which was denied. After a few more hours, the jury sent another note to the trial court, writing:

> Your Honor, as a jury we have come to a unanimous decision on several charges . . . . We have signed verdict sheets on other charges. We are hopelessly deadlocked and do not see a path to a unanimous decision. We have left these verdict sheets blank. We have deliberated on all evidence presented many times and have multiple jurors who have stayed firm in their decision. Thank you[.]

Defense counsel then asked the trial court to declare a mistrial for the charges on which the jury indicated it was deadlocked.

When the jury returned, the foreperson stated the jury had reached a unanimous verdict as to twenty "counts" but further deliberation "would not resolve the deadlock." The jury unanimously found Defendant guilty of four counts of

discharging a weapon into an occupied vehicle, one count of assault with a deadly weapon with intent to kill, and fifteen counts of attempted discharge of a firearm into an occupied vehicle. Since the foreperson did not believe there was a reasonable possibility the jury could come to a unanimous verdict for the remaining charges, the trial court declared a mistrial for those remaining charges, including one count of discharging a weapon into an occupied vehicle, two counts of assault with a deadly weapon with intent to kill, and three counts of attempted first degree murder.

The trial court then sentenced Defendant to four consecutive active sentences of twenty-four to forty-one months' imprisonment and ordered Defendant to pay restitution to White in the amount of $1,400.00 jointly and severally with Jackson. Defendant timely appealed.

## II. <u>Jurisdiction</u>

This Court has jurisdiction to hear Defendant's appeal from a final judgment, pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

## III. <u>Analysis</u>

Defendant argues the trial court (A) abused its discretion by allowing the State to present inadmissible evidence of two stolen firearms that were not related to the charged crimes, (B) abused its discretion by admitting gang-related evidence, and (C) erred in ordering restitution when the amount was not supported by competent evidence. We address each argument in turn.

### A. Stolen Firearms

Defendant first argues the trial court abused its discretion when it found defense counsel "opened the door" to evidence of two stolen firearms that were unrelated to the charged offenses. Additionally, Defendant asserts the trial court erroneously allowed the State to ask Detective Whitley about the two stolen firearms because the evidence was irrelevant and "prejudicial in a close case where [the] identity of the shooter was highly contested, and the jury struggled to reach a unanimous verdict."

### 1. *Preservation and Standard of Review*

As an initial matter, we must address the State's contention that this issue is not preserved for appellate review because Defendant failed to timely object to this evidence.

"[T]o preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1) (2025). "To be timely, an objection to the admission of evidence must be made at the time it is actually introduced at trial. An objection made only during a hearing out of the jury's presence prior to the actual introduction of the testimony is insufficient." *State v. Snead*, 368 N.C. 811, 816 (2016) (internal citations and quotations marks omitted). In other words, "a trial court's evidentiary ruling on a pretrial motion is *not* sufficient to preserve the issue of admissibility for appeal unless a defendant renews the objection during trial." *State*

*v. Oglesby*, 361 N.C. 550, 554 (2007).

Here, although Defendant's trial counsel objected to the State's evidence regarding the two stolen firearms, this objection was made outside the presence of the jury. Moreover, defense counsel failed to renew his objection when the State offered this evidence at trial. As such, Defendant failed to preserve this issue for appellate review. *See Snead*, 368 N.C. at 816; *Oglesby*, 361 N.C. at 554.

In the alternative, Defendant argues this Court should review this issue for plain error under Rule 401. Plain error review is "reserved for grave error which amounts to a denial of a fundamental right of the accused, and . . . focuses on error that has resulted in a miscarriage of justice or the denial of a fair trial." *State v. Reber*, 386 N.C. 153, 158 (2024) (citations and internal quotation marks omitted). Further, although plain error review "is reserved for evidentiary or instructional errors[,]" *id.* at 163, it is generally "unavailable for issues that fall 'within the realm of the trial court's discretion[,]'" *State v. Gillard*, 386 N.C. 797, 821 (2024) (citation omitted).

Here, since "[a] trial court's decision to admit or exclude evidence to which a party has opened the door" is within the trial court's discretion, *see State v. McKoy*, 385 N.C. 88, 97 (2023) (citing *State v. Darden*, 323 N.C. 356, 359 (1988)), we decline to address Defendant's "opening the door" argument, *see Gillard*, 386 N.C. at 821.[3]

---

[3] Defendant alternatively asks this Court to review this issue pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure because "[a]llowing [Defendant's] convictions to stand in a close case after the State destroyed evidence and admitted impermissible evidence would be a manifest

Where a defendant challenges a trial court's rulings on relevancy, however, such rulings "are technically not discretionary, [and] we must review [the] defendant's [unpreserved] challenge under Rule 401" for plain error. *Gillard*, 386 N.C. at 821.

"[T]o establish plain error[, the] defendant must show that a fundamental error occurred at his trial and that the error 'had a probable impact on the jury's finding that the defendant was guilty.'" *State v. Towe*, 366 N.C. 56, 62 (2012) (quoting *State v. Lawrence*, 365 N.C. 506, 517 (2012)). Additionally, since the plain error rule is "applied cautiously and only in the exceptional case," the defendant must also show "that the error is an 'exceptional case' that warrants plain error review, typically by showing that the error seriously affects 'the fairness, integrity or public reputation of judicial proceedings.'" *Reber*, 386 N.C. at 158 (citations omitted). We now turn to consider whether Defendant has successfully shown the trial court plainly erred by admitting evidence he contends was irrelevant.

### 2. Rule 401

Under our Rules of Evidence, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by" the North

---

injustice." Under Rule 2, this Court may "suspend or vary the requirements or provisions of any Rules of Appellate Procedure in a case pending before it upon application of a party or upon its own initiative to prevent manifest injustice to a party . . . ." *State v. Radomski*, 294 N.C. App. 108, 112 (citation modified), *review denied,* 386 N.C. 557 (2024), and *writ denied,* 904 S.E.2d 548 (N.C. 2024). Rule 2, however, "must be applied cautiously" and only in "in exceptional circumstances[.]" *State v. Hart*, 361 N.C. 309, 315 (2007) (citations omitted). Here, Defendant has failed to demonstrate how this case warrants invoking Rule 2. As such, we decline to invoke Rule 2 in our discretion.

Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 402 (2023). "Evidence which is not relevant is not admissible." *Id.* Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2023). To be admissible, the evidence does not have to "bear directly on the question in issue[;] [] evidence is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known, to properly understand their conduct or motives, or if it reasonably allows the jury to draw an inference as to a disputed fact." *State v. Riddick*, 316 N.C. 127, 137 (1986) (citation omitted).

"It is a well[-]settled principle that weapons may be admitted into evidence when there is evidence tending to show that they have been used in the commission of a crime." *State v. Peterson*, 59 N.C. App. 650, 652 (1982) (citing *State v. Wilson*, 280 N.C. 674 (1972)). When there is no evidence linking a firearm to the commission of a crime, however, the firearm evidence is irrelevant, and the admission of such evidence constitutes error. *See id.* (awarding the defendant a new trial because the trial court's error in admitting evidence of a sawed-off shotgun, which "was not connected to the robbery and [] was clearly not relevant to any issues in the case[,]" prejudiced the defendant). Further, the erroneous admission of evidence of firearms when there is no "scintilla of evidence linking . . . the guns to the crimes charged" may rise to plain error where the identity of the perpetrator is the sole issue at trial.

*See State v. Samuel*, 203 N.C. App. 610, 621 (2010) (concluding the trial court plainly erred in admitting irrelevant evidence of two guns found in the defendant's home because of "the weakness in the State's evidence that [the d]efendant was the assailant[,] [] the substantial evidence tending to show that [the d]efendant was not the assailant," and "the prosecutor's reliance upon the revolver to link [the d]efendant to the crimes charged, had 'a probable impact on the jury's finding that the defendant was guilty'" (citation omitted)).

In this case, Detective Whitley testified that, while Lieutenant Hefner was knocking on the apartment door, someone threw two guns out of the apartment window. According to the State's evidence, neither of these firearms were of the same caliber as the firearm that was used during the Circle K shooting. Nevertheless, even though the two stolen firearms were not used in the Circle K shooting, such evidence was admissible to explain why the "knock and talk" went on "for a while" and why law enforcement detained Jackson, Defendant, and Carr immediately after they exited the apartment. *See Riddick*, 316 N.C. at 137. As such, the trial court did not err in admitting this evidence.

But even if the admission of such evidence was error, Defendant has not shown that, absent this evidence, the jury probably would have reached a different result. *See Towe*, 366 N.C. at 62. Defendant relies on *Samuel* to argue this evidence was "especially prejudicial in a close case where the identity of the shooter was heavily contested." But, unlike *Samuel*, where the State relied on the irrelevant firearm

evidence to link the defendants to the crime, *see Samuel*, 203 N.C. App. at 621, the State in the instant case did not rely on the evidence regarding the two stolen firearms to link Defendant to the Circle K shooting. Rather, the State relied on the surveillance videos, pictures of the red shoes and long-sleeved shirt with a Kappa logo that law enforcement found in Defendant's apartment, and body camera footage to link Defendant to the Circle K shooting. Therefore, even if the trial court erred in admitting evidence regarding the two stolen guns, Defendant has not met his burden of showing that this assumed error rose to the level of plain error.

## B. Gang-Related Evidence

Defendant next argues the trial court erred by allowing the State to introduce parts of the jail phone calls that contained gang-related terms. Specifically, Defendant argues the gang-related evidence was irrelevant, inflamed the jury, and prejudiced Defendant by unfairly tilting the scales in favor of the State in a close case where the perpetrator's identity was at issue.

### 1. *Preservation and Standard of Review*

Ordinarily, a trial court's determination of whether to admit evidence under Rule 403 is reviewed for an abuse of discretion. *State v. Triplett*, 368 N.C. 172, 178 (2015). The State, however, asserts this issue is not preserved for appellate review because, although defense counsel mentioned "the evidence should not come in under Rule 403[,]" his objection "was almost exclusively trained on its admissibility under Rule 404."

As stated, "to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10 (2025). Additionally, where a "party made a specific objection outside the presence of the jury, a general objection in the presence of the jury can be sufficient when it is clear from context the party was renewing the same objection made outside the presence of the jury." *State v. Jones*, 288 N.C. App. 175, 180 (2023) (citation omitted).

Here, the Record indicates that defense counsel objected outside the presence of the jury to the relevancy and the prejudicial value of the gang-related terminology. When the State published the jail phone calls as Exhibit 14, defense counsel objected, stating: "Previous objection to certain aspects maintaining all constitutional [and] statutory bas[e]s. The Court has ruled." Although defense counsel did not specify that he was renewing his Rule 403 objection, it "is clear from context [that defense counsel] was renewing the same objection made outside the presence of the jury." *See id*. Therefore, this issue is preserved for our appellate review.

Since we conclude this issue is preserved for appellate review, we proceed to review the trial court's Rule 403 determination for an abuse of discretion. "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Hayes*, 314 N.C. 460, 471 (1985). "In our review, we consider not whether we might

disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *Triplett*, 368 N.C. at 178 (citation omitted). Moreover, if the trial court did abuse its discretion, Defendant has the burden to show "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial . . . ." N.C.G.S. § 15A-1443 (2023).

## 2. *Rule 403*

While all relevant evidence is generally admissible, *see* N.C.G.S. § 8C-1, Rule 401, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[,]" N.C.G.S. § 8C-1, Rule 403 (2023). "'Unfair prejudice,' in the context of Rule 403, means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.'" *State v. Joyner*, 299 N.C. App. 93, 99 (2025) (quoting *State v. Buchanan*, 288 N.C. App. 44, 48 (2023)).

"This Court has recognized that admission of gang-related testimony tends to be prejudicial[.]" *State v. Hinton*, 226 N.C. App. 108, 113 (2013). "Evidence which is probative of the State's case[, however,] necessarily will have a prejudicial effect upon the defendant; the question is one of degree." *State v. Coffey*, 326 N.C. 268, 281 (1990). Thus, "to be excluded under Rule 403, the probative value of the evidence must not only be outweighed by the danger of unfair prejudice, it must be *substantially* outweighed." *State v. Jones*, 347 N.C. 193, 213 (1997) (citation omitted).

In *State v. Gayton*, the defendant appealed his convictions of trafficking in cocaine and carrying a concealed weapon after the State introduced evidence regarding the defendant's gang affiliation at trial. 185 N.C. App. 122, 123–24 (2007). The evidence at issue in *Gayton* consisted of multiple police officers' testimonies that the gang the defendant was associated with was, *inter alia*, "notoriously violent and commonly associated with guns, violence, and drugs[.]" *Id.* at 124. This evidence, however, was completely irrelevant—and the admission thereof a violation of Rule 401—as it had "nothing to do with" the charged offenses. *Id.* at 125. This evidence also violated Rule 403 as "the only probative value the information had . . . was to portray [the] defendant as a gang member." *Id.* Nonetheless, this Court held the inadmissible gang-related evidence was not prejudicial enough to warrant a new trial because, absent this evidence, the State presented "overwhelming" evidence of the defendant's guilt. *Id.* at 126; *cf. Hinton*, 226 N.C. App. at 114–16 (distinguishing *Gayton* and holding "the extensive gang-related testimony" was irrelevant, "carried the danger of unfair prejudice that substantially outweighed its non-existent probative value[,]" and rose to the level of plain error because the State did not present any evidence linking the defendant to the crime scene).

Here, although no one testified that Defendant was in a gang, and there is no evidence indicating the jury knew the terms "rolling 6-0's, affiliated, and flag" referenced gang-related activity, we assume, *arguendo*, that this evidence was irrelevant and the admission of such evidence was prejudicial. *See Hinton*, 226 N.C.

App. at 113. Like *Gayton*, however, the State presented "overwhelming" evidence linking Defendant to the Circle K shooting. *See Gayton*, 185 N.C. App. at 126. First, the State presented the surveillance videos, which showed a man wearing red shoes and a red, long-sleeved shirt with a Kappa logo walk into the Circle K with Jackson and speed away in the gold sedan. Second, although no one was able to positively identify the man in the red shirt, Defendant, during the jail phone calls, admitted he was at the Circle K when the men in black pulled a gun out on Jackson. Third, the State presented photos of the red shoes and red, long-sleeved shirt that law enforcement found while searching Defendant's apartment. Thus, even if the trial court abused its discretion by admitting this gang-related evidence, we cannot say there is a reasonable possibility the jury would have reached a different result had the trial court excluded all the sporadic references to gang-related activity. *See* N.C.G.S. § 15A-1443.

### C. Restitution

Lastly, Defendant argues the trial court erred in ordering restitution in the amount of $1,400.00 because this specific amount was not supported by the evidence. We agree.

This Court reviews awards of restitution de novo. *State v. Hunt*, 250 N.C. App. 238, 253 (2016). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Gray*, 299 N.C. App. 728, 730 (2025) (citation omitted).

Under N.C.G.S. § 15A-1340.34, a trial court may order "the defendant make restitution to the victim . . . for any injuries or damages arising directly and proximately out of the offense committed by the defendant." N.C.G.S. § 15A-1340.34(b) (2023). Although "the quantum of evidence needed to support a restitution award is not high," *State v. Moore*, 365 N.C. 283, 285 (2011), "the amount of restitution recommended by the trial court must be supported by evidence adduced at trial or at sentencing[,]" *State v. Wilson*, 340 N.C. 720, 726 (1995) (citation omitted).

To determine whether the amount of restitution is supported by the evidence, we consider our prior case law, which reveals three approaches: "(1) when there is no evidence, documentary or testimonial, to support the award, the award will be vacated"; "(2) when there is specific testimony or documentation to support the award, the award will not be disturbed"; and (3) when there is "'some evidence' to support an award of restitution[, but] the evidence [is] not specific enough to support" the award, the award will be vacated and remanded to the trial court for a new hearing to determine the correct amount. *See Moore*, 365 N.C. at 285–86; *see also State v. Villarreal*, 296 N.C. App. 136, 143 (2024) ("In *Moore*, our Supreme Court identified a third approach for cases that fall in between [the first two approaches.]" (citation and internal quotation marks omitted)). Many cases fall into the third category. *See Moore*, 365 N.C. at 286 (concluding the victim's testimony that the repairs cost "thirty-something thousand dollars" supported an award of restitution but such testimony "was not specific enough to support the award of $39,332.49");

*Villarreal*, 296 N.C. App. at 144 (holding the victim's testimony that "the minimum value of" the personal property taken from his house was $20,000.00 and that he was able to recover some of the property supported a restitution award, but was not specific enough to support the award of $12,264.70).

Like many cases, this case also falls into the third category. As the restitution worksheet indicates, White requested restitution in the amount of $1,400.00. At the sentencing hearing, the State argued this amount "was based on [White's] testimony at trial that he had recently paid about $1400[.00] for that car, and as a result of the damage had to scrap it and was not able to recoup any of those costs." Indeed, White had testified the car was totaled, and he was unable to "do anything with" the car; however, White also testified that he bought the car for "*under* $1,400." (Emphasis added.) While a victim may testify regarding the approximate expense, *see State v. Hunt*, 80 N.C. App. 190, 195 (1986) (leaving the restitution amount of $18,364.00 undisturbed because the victim testified his hospital bill was $10,364.00 and the doctor's bill was "around $8000[.00]"), White's testimony that he paid "under" the requested restitution amount is too vague to support an award of restitution for $1,400.00, *see Moore*, 365 N.C. at 286. As such, we vacate the restitution award and remand to the trial court for a new hearing to determine the appropriate amount of restitution. *See id.*

## IV. Conclusion

Upon careful review, we hold the trial court did not err by admitting evidence

relating to the two stolen firearms and the gang-related evidence. However, because the evidence presented did not support the awarded amount of restitution, we vacate the restitution award and remand to the trial court for a new hearing to determine the appropriate amount of restitution.

NO ERROR IN PART; VACATED IN PART AND REMANDED.

Judges ARROWOOD and HAMPSON concur.

Report per Rule 30(e).